IN THE MATTER OF THE APPEAL OF AMP INCORPORATED
FROM THE DECISION OF THE STATE BOARD OF ASSESS-
MENT, SITTING AS THE STATE BOARD OF EQUALIZATION
AND REVIEW, AFFIRMING THE ACTION OF THE GUILFORD
COUNTY BOARD OF COMMISSIONERS ASSESSING ADDI-
TIONAL TAXES, PENALTIES AND INTEREST FOR THE
YEARS 1964 THROUGH 1968, INCLUSIVE

No. 99

(Filed 26 June 1975)

1. Taxation § 25— ad valorem taxes— review of order of State Board of
Assessment

Upon review of an order of the State Board of Assessment (now
the Property Tax Commission), the superior court is without authority
to make findings at variance with the findings of the Board when the
findings of the Board are supported by competent, material and sub-
stantial evidence. G.S. 145-315 (now G.S. 150A-51.)

2. Taxation § 38— ad valorem tax assessment — presumption of correct-
ness — burden of proof

Ad valorem tax assessments are presumed to be correct, and when
such assessments are challenged, the burden of proof is on the taxpayer
to show that the assessment was erroneous.

3. Taxation § 38— ad valorem taxes — attack on valuation — showing
required of taxpayer

In order for a taxpayer to rebut the presumption of correctness
of an ad valorem tax assessment, he must produce competent, material
and substantial evidence that the county tax supervisor used an arbi-
trary or illegal method of valuation and that the assessment sub-
stantially exceeded the true value in money of the property.

4. Taxation § 25— ad valorem taxes — book value — illegal method of
valuation

There is no statutory authority that permits a county tax super-
visor, as a per se rule, to equate "book value" with true value in money
as a uniform measure of assessment for purposes of ad valorem tax
valuation; therefore, a county tax supervisor used an "illegal" method
of valuation in requiring the taxpayers of the county to list inventories
at book value as reported on State tax returns.

5. Taxation § 25— ad valorem taxes — listed values of inventories — in-
sufficient evidence

Taxpayer failed to offer competent, material and substantial evi-
dence to support ad valorem valuations listed by it for its inventories
for the years 1964-1968.

6. Taxation § 25— ad valorem taxes — scrap metals — value

The "true value in money" for ad valorem taxation purposes of
brass and copper scraps accumulated by a manufacturer of electronic

terminals is the prices offered by the supplying mills to whom such scrap is "usually" and "freely" sold by the manufacturer.

**7. Taxation § 25— ad valorem taxes — goods in process — value**

The value for ad valorem taxation of the non-defective in-process inventory of a manufacturer of electronic terminals is not the scrap value but is the cost of replacing the inventory plus labor and overhead.

**8. Taxation § 25— ad valorem taxes — raw material inventory — value**

The value for ad valorem taxation of the raw material inventory of a manufacturer of electronic terminals is not the scrap value but is the cost of replacing the inventory.

**9. Taxation § 25— ad valorem taxes — raw materials and in-process inventories — value — use of book value**

Finding by the State Board of Assessment that "book value" constituted the "true value in money" for ad valorem taxation of the raw material and in-process inventories of a manufacturer of electronic terminals was supported by competent, material and substantial evidence where the evidence showed that such "book values" were based on the manufacturer's own figures furnished to the State of North Carolina for income and franchise tax purposes, and that the manufacturer's accounting procedures are structured so as to define and compute "book value" as replacement cost plus labor and overhead, which is the proper standard for valuing the manufacturer's raw material and in-process inventories.

**10. Taxation § 25— ad valorem taxes — understatement of inventories — discoverable property**

The differences between the total values of inventories listed by a taxpayer on ad valorem taxation abstracts and the values found by the State Board of Assessment to be the true value in money of the inventories constituted discoverable property under G.S. 105-331.

Justice EXUM did not participate in the consideration or decision of this case.

Justice LAKE dissents.

ON *certiorari* to review decision of the North Carolina Court of Appeals reported in 23 N.C. App. 562, 210 S.E. 2d 61 (1974) (opinion by *Brock, C.J., Morris and Martin, J.J.,* concurring), which reversed the judgment filed by Exum, J., on 25 January 1974 (said judgment having reversed a final decision entered by the State Board of Assessment, sitting as the State Board of Equalization and Review), and remanded the cause to the Guilford County Superior Court with directions that an order be issued reinstating and affirming the decision of the State Board.

In re Appeal of Amp, Inc.

All references herein to statutes contained in Chapter 105 of the General Statutes refer to the applicable provisions prior to their revision or recodification pursuant to Chapter 806, 1971 Session Laws, effective 1 July 1971. Also, for convenience, the petitioner appellant is hereinafter referred to as "AMP"; the respondent appellee is hereinafter referred to as either "Guilford County" or "the County"; and the State Board of Assessment (now the Property Tax Commission—see G.S. 105-288) is hereinafter referred to as the "State Board."

AMP is a corporation engaged in the business of manufacturing various electronic parts and components and owns and operates a manufacturing plant at 1126 Church Street in Greensboro, North Carolina, and at other locations both within and outside of the State of North Carolina.

AMP duly and timely filed "Business Property Abstracts" (hereinafter referred to as abstracts) in accordance with G.S. 105-306 through 105-309 for the taxable years 1964-1968, inclusive, and made the following tax payments for which it was billed as a result of filing said abstracts:

Table I*

| Year | Tax |
|------|-----|
| 1964 | $ 11,555.73 |
| 1965 | 11,724.06 |
| 1966 | 12,026.60 |
| 1967 | 13,534.23 |
| 1968 | 13,044.07 |
| Total | $ 61,884.69 |

*All computations, listings, valuations, etc., have been listed in chronological tabular form for the purposes of this opinion.

Included in these abstracts were the following valuations for current inventories:

Table II

| Year | Inventory Valuation |
|------|---------------------|
| 1964 | $ 399,278.00 |
| 1965 | 448,101.00 |
| 1966 | 460,734.00 |

In re Appeal of Amp, Inc.

Table II — continued

| Year | Inventory Valuation |
|------|---------------------|
| 1967 | 454,801.00 |
| 1968 | 238,651.00 |
| Total | $ 2,001,565.00 |

By letter dated 21 August 1969 the Tax Supervisor of Guilford County (hereinafter referred to as Tax Supervisor), purporting and claiming to act under the authority of G.S. 105-331 (now G.S. 105-312), notified AMP that he intended to increase the valuation of inventories of AMP for the years 1964-1968, inclusive, to the following amounts:

Table III

| Year | Inventory Value |
|------|-----------------|
| 1964 | $   477,769.00 |
| 1965 | 843,327.00 |
| 1966 | 1,205,369.00 |
| 1967 | 1,565,711.00 |
| 1968 | 1,402,489.00 |
| Total | $ 5,494,665.00 |

Based upon this adjustment to inventories for the years 1964-1968, inclusive, the Tax Supervisor proposed to assess against AMP the following additional taxes, penalties and interest beginning with the year 1964:

Table IV

| Year | Tax | Penalty | Total |
|------|-----|---------|-------|
| 1964 | $     653.83 | $   392.30 | $  1,046.13 |
| 1965 | 3,472.06 | 1,736.03 | 5,208.09 |
| 1966 | 6,619.81 | 2,647.92 | 9,267.73 |
| 1967 | 9,992.64 | 2,997.79 | 12,990.43 |
| 1968 | 11,039.00 | 2,207.80 | 13,246.80 |
| GRAND TOTAL | | | $41,759.18 |

AMP, through its local counsel, duly and timely gave the Tax Supervisor notice of protest against the proposed assess-

ments and denied any liability therefor. The matter was thereafter set for hearing before the County Board pursuant to the provisions of G.S. 105-331(b) and the hearing was held on 2 September 1969. On 15 September 1969 the County Board approved and confirmed the proposed assessment (Table IV) on the basis that AMP had failed to report all of its inventories for the years 1964 through 1968, inclusive, and that the underreporting of these inventories was subject to being discovered under G.S. 105-331 (now G.S. 105-312). Both the Tax Supervisor and the County Board arrived at the valuation of inventories in the assessment appealed from by referring to inventories shown on North Carolina income tax returns filed by AMP with the State of North Carolina and by deducting therefrom inventories reported to Forsyth, Mecklenburg and Wake Counties, attributing the remaining balance to Guilford (AMP's only other location within the State).

AMP duly and timely noted its exception to the ruling of the County Board and gave notice of appeal to the State Board. At the 19 February 1970 hearing before the State Board, AMP presented the following evidence, summarized except where quoted.

Herbert M. Cole, the local AMP plant manager, testified that at its Greensboro facility AMP manufactured various types of solderness connectors for the electronics industry. These connectors are used to terminate wires contained in various types of electronic equipment.

Cole described the manufacturing process as follows:

The process begins with the receipt of brass, copper and other metals. These metals are received in strips approximately five to eight inches wide that are coiled in large rolls. These coils are first run through a machine called a "slitter" that slices the coiled material into narrow strips depending on the length of the terminal to be produced in the forming dies. After the material is slit, it is reeled into rolls called "pancakes." These "pancakes" are then carried to a storage area where they remain until such time as AMP is in a position to run them through the forming dies to manufacture a specific type of electrical terminal. When the time comes, material handlers carry the "pancakes" to stamping machines located in the press room and run the forming dies to produce the terminals. The terminals then undergo various types of metal plating.

The handling, slitting, forming and plating processes all generate substantial amounts of scrap material. For example, as "pancakes" are run through the forming die certain tools in the die eventually wear out, which results in the manufacture of terminals with dimensions out of specification. Such faulty terminals must be scrapped since AMP's customers cannot use them. Also, materials in raw form are sometimes scrapped. As stated earlier, these materials arrive in coil form. Sometimes a truck driver, or AMP's own personnel, will drop these coils. If this happens, or if the edges of these coils are dented or fouled in any other manner, then the coil must be scrapped because AMP cannot use anything that has rough edges. Such damaged metal will not go through the forming dies.

Scrap generated by all of the above listed causes is gathered two or three times daily. The scrap is then held until such time as approximately 40,000 pounds of either brass or copper or a combination of both has been accumulated. Such accumulation usually occurs once every week. At this time, Mr. George R. Beck, Director of Purchases for AMP, is contacted at the home office in Harrisburg, Pennsylvania, and he arranges to sell it to one or more of the mills from whom AMP purchases its raw materials.

Mr. Beck, previously identified, testified that as Director of Purchases he supervised the procurement of all production materials, expense items and capital equipment at all of AMP's plants and that he also supervised the sale of scrap. Beck stated that he was familiar with AMP's Greensboro operation and that during the 1964-68 period the operation of that plant remained essentially the same. As to the sale of scrap materials, Beck testified as follows:

". . . Among my duties are the handling of sales of scrap materials resulting from Greensboro Plant operations. Scrap that results from the Greensboro operations is always sold to the suppliers from whom we procure our raw materials. It is sold at published prices. The selling of scrap is a customary and regular activity of the company in the course of its business. During the years 1964 through 1968, approximately 50% of the raw material used by the company in its Greensboro Plant went into scrap. Raw materials that have been damaged in some manner prior to being put into process are sold at published scrap prices. The Company also has occasion to sell items of in-process

inventory and, when it does, scrap prices are received for such sales. Items of in-process inventories which are sold could not be completed into finished products by another manufacturer. As to whether or not any special equipment is required for the customer to further process Amp's products after Amp ships them to the customer, the whole business is predicated on the premise that Amp furnishes its customers with devices which cannot be used for the most part until the customer uses application equipment designed and manufactured by Amp, Inc."

On cross-examination by Guilford County, Mr. Beck testified that generally AMP had been manufacturing the same line of products since 1964. *He also stated that one-half of the raw metal received by the Greensboro plant was reduced to scrap during the manufacturing process* and that mills supplying AMP with the raw material (brass and copper coils) repurchased this scrap at published prices supplied to the Harrisburg office. Beck added that, "Roughly 40% of raw material costs are recouped from the sale of scrap although the precise percentage varies with market conditions." Thus, according to Beck, for every pound of raw material AMP purchased it recouped approximately 40% of the original purchase price in scrap sales.

Ernest L. Price, Tax Manager for AMP, testified that his duties included responsibility for the entire tax liability of the corporation and its affiliates to ALL taxing authorities. Specifically, as to the Greensboro operation, Mr. Price testified as follows:

"... During the years 1964 through 1968, Amp, Inc. was on a calendar year basis for income tax purposes. I have made a computation of percentage of scrap generated from the processing of raw materials at the Greensboro Plant for each of the years 1964 through 1968, based upon the raw materials that are issued into production during the year as compared with the scrap generated during that year. These figures are based on the books and records of the Company."

Following the above quoted testimony, Mr. Price testified as to certain relevant statistical data. We have summarized this testimony in tabular form.

In re Appeal of Amp, Inc.

## Table V

| Year | Percentage of Scrap Generated To Raw Materials Issued |
|------|------|
| 1964 | 50.4% |
| 1965 | 50.5% |
| 1966 | 51.3% |
| 1967 | 54.2% |
| 1968 | 49.8% |

## Table VI

| Date | Book Value of Finished Goods At Greensboro Plant |
|------|------|
| 1 January 1964 | $177,585.00 |
| 1 January 1965 | 223,360.00 |
| 1 January 1966 | — 0 — |
| 1 January 1967 | — 0 — |
| 1 January 1968 | — 0 — |

Mr. Price then testified that under the accounting used by AMP *book value was defined as the lower of cost or of market.* At this point, the witness testified as follows as to the "true cash value" of AMP's Greensboro inventories on the relevant valuation dates. For the purposes of comparison, we have listed these figures with those originally included in AMP's abstracts. *See* Table II, *supra.*

## Table VII

| Year | Book Value of Inventories on 1 January | True cash Value of Inventories on 1 January as Computed by Mr. Price | Value Originally Reported by AMP On Business Property Abstracts |
|------|------|------|------|
| 1964 | $ 464,758.00 | $ 287,622.00 | $ 399,278.00 |
| 1965 | 1,034,066.00 | 549,726.00 | 448,101.00 |
| 1966 | 1,012,055.00 | 412,968.00 | 460,734.00 |
| 1967 | 614,604.00 | 218,250.00 | 454,801.00 |
| 1968 | 400,725.00 | 78,281.00 | 238,651.00 |
| Totals | $ 3,526,208.00 | $ 1,546,847.00 | $ 2,001,565.00 |

Mr. Price then described how he had computed the "true cash values" of inventories as listed in Column 3 of Table VII, *supra.* He stated that all of his computations were based on the theory that AMP could only sell "in-process" inventory back to

the supplier since a customer would not use them. Price's computations are best explained by use of the following mathematical equation (Price's own example taken from his 1 January 1968 figures) :

### Table VIII

| | |
|---|---|
| $ 304,115.00 | Book Value of In-Process Inventory on 1-1-68 |
| —193,600.00 | (Less) Direct Overhead as of 1-1-68 |
| | |
| $ 110,515.00 | |
| — 36,801.00 | (Less) Full Cost of In-Process Materials Scrapped as of 1-1-68 |
| $  73,714.00 | |
| + 96,610.00 | (Add) Book Value of Raw Material Inventory on 1-1-68 |
| $ 170,324.00 | |
| ×      .4596 | (Multiply) Relation of Scrap Price to Book Value |
| $   78,280.91 | TRUE CASH VALUE OF INVENTORIES AS OF 1 JANUARY 1968 (Rounded off to $78,281.00 in Table VII, *supra)* |

Mr. Price pointed out that AMP had no finished goods on hand as of 1 January 1968 and explained that this was why his computations for that year only included in-process and raw material inventories. *See* Table VI, *supra.* However, he conceded that if AMP had had finished goods on hand as of 1 January 1968, then he would have recognized the "book value" of such goods as "true cash value."

On cross-examination by Guilford County, Mr. Price stated that AMP had obtained the services of the professional appraisal firm of Dawson, Desmond and Van Cleve to prepare and file the business property abstracts of the Greensboro plant for the years in question. *See* Table II, *supra.* Price admitted that the values he testified to in Column 3, Table VII, *supra,* were "inconsistent with the values Dawson, Desmond and Van Cleve gave to Guilford County" in the business property abstracts filed by and signed by them for each of the respective years. *See* Table VII, *supra.* He sought to explain this inconsistency as follows:

". . . The reason for this difference is that we asked the Dawson, Desmond and Van Cleve firm to evaluate true

cash value for us because at that time, frankly, we did not know how to do it. We did not know how to go from book value to cash value, and I was busy with other things, other responsibilities. . . . They were qualified at that point. . . . They knew how and I did not. So they handled it. We gave them all the necessary basic information on which they could make their determination. We did not get into a computation of true cash value, our own computation, until after Guilford County told us in 1968 that we owed them a lot of money. Frankly, that shook us up because we thought everything was fine. I was very disturbed about it. It's our policy to report correct figures and we don't like things to backfire like this. . . . We learned to do this after you people forced us to get into it. We thought everything was all right. Now we find out that the agents, Dawson, Desmond and Van Cleve, using their judgment in all those years, were too high except one time. [1965—see Table VII.] I guess they did the best they could."

On cross-examination by the State Board, Mr. Price elaborated further on the alleged misfeasance of AMP's agent as follows:

". . . As to why the figures we have testified to are generally lower than the figures reported by Dawson, Desmond and Van Cleve, they represent many taxpayers, a broad section. Most taxpayers have raw materials that can be used interchangeably between different manufacturers and I feel that they failed to recognize that we could only get scrap for those materials and I didn't know it at the time. I hadn't gotten into it. They failed to recognize that our raw materials were so unique that we do get nothing but scrap for them. They used general valuation criteria and failed to take into consideration our unique position and, as I say, I did not know it at the time. . . . They will never disclose exactly their method because they are giving away their trade secrets and their know-how. . . . I don't know how they arrived at the computation."

Finally, Mr. Price accounted for the lack of any "finished goods" at the Greensboro plant on 1 January 1966, 1 January 1967, and 1 January 1968 as follows:

". . . The Company decides where it will keep finished goods inventories as a matter of efficiency in doing busi-

ness. It is clear that in those years the Company decided that finished goods from the Greensboro Plant would be shipped to another location to be managed there. That is a management decision."

AMP's final witness before the State Board was Mr. William H. Westphal, a partner in the firm of A. M. Pullen, Inc., Certified Public Accountants, and a recognized expert in taxation. Mr. Westphal, in answer to a hypothetical question, stated that it was his opinion that on the valuation date raw materials and in-process inventories had a true value in money equivalent to their scrap value. He said that scrap value was "the best available evidence of the amount of cash or accounts receivable into which the subjects may be transmuted at the given date, the assessment date." Mr. Westphal based his expert opinion on the following:

". . . To arrive at this conclusion, I would like to say first that I am giving this statute the definition that seems reasonable to me under the circumstances, taking the terms and words and phrases that are used in their various contexts in the usual meaning. I am considering that this means that one approaches the focal assessment date and makes the determination at that date of approximately how much cash could be derived from the sale of the subjects, that is the underlying materials, that are available for sale if they should be sold at that date in their present state. To me, this does not mean that we should project into the future and undertake to ascertain what this might be sold for if we went on the assumption that certain processes would be added and that there would be certain added expenditures of labor and overhead. I think the crucial question is what will these products bring in their presently existing state at this particular time, because this does not make a reference to book value, or cost, or lower of cost or market, but the cash realizable value.

* * * * * * *

". . . The Statute . . . seems to me to speak clearly and unmistakably of cash value, the cash into which these subjects, these properties, might be transmuted at that specific date if sold, not on a forced sale basis, but in an orderly manner following the general procedures of the firm, the manner in which property in that condition is sold, and this I think is what we are determining here. . . . So here

we are not using a method that anticipates a completion of the goods. We are not assigning an accounting technique, a going concern value to this inventory on the assumption that this is what it is worth to this taxpayer in the course of trade or business. We are trying to determine what the cash value would actually be, and I think these sales prices are the best evidence of the amount into which these goods could be transmuted."

Guilford County presented the following evidence, summarized except where quoted, to the State Board. Mr. C. R. Brooks, Guilford County Tax Supervisor since 1 July 1965, testified, in pertinent part, as follows:

". . . The instructions contained in the business property tax returns contain the following language, 'All property must be reported at 100 per cent of cost to the nearest dollar amount, even though it may not be completely paid for. The dollar amount should come from your records, such as books of account, invoices, or tax depreciation schedules.' I interpret this language to mean that the reporting values should be given to the County directly from the records of the books of a taxpayer. These values should also be the same as that reported on the State Income and franchise returns."

Brooks further testified, on cross-examination by AMP, that he "assumed" that the cash value of the inventory is determined by the cash value figures furnished on the State tax returns. However, he added that he did not know the State's requirements for its tax returns insofar as whether they called for cash value or book value. In his opinion, there was "no difference between the reporting on the State corporate income tax returns, income and franchise returns, and that reported on the ad valorem listings because of the cash factor," although he had made no inquiry to determine the correctness of this opinion.

Finally, Mr. Brooks testified as follows as to the previous testimony of AMP's expert, Mr. Westphal:

"I heard Mr. Westphal's statement that book value is used as an item for measuring income and not value. As to whether I take exception to his statement, I think you are confusing ad valorem tax with income reporting. This is based on my assumption that State income tax reporting

and County ad valorem tax reporting is on the same basis, or should be on the same basis. As I have previously stated, that is my assumption which is not based on any knowledge that I have about the State returns."

Mr. Ronald Waters, a staff accountant in the office of the Guilford County Accountant, testified that he had been employed by the County from 1965 through 1969 as Assistant Tax Supervisor. He further stated that in this capacity he was in charge of the Business Personal Property Section of the Tax Department and had occasion to conduct audits of a number of firms who listed property for ad valorem tax purposes. Of all the firms he audited, approximately 95% reported inventories with values for ad valorem tax purposes consistent with the values given to the State for income and franchise tax purposes.

By order issued 5 May 1970 the State Board found that the value of AMP's inventories for ad valorem tax purposes was represented by the figures reflected in its books and records and that the differences between the book values and the amounts listed for ad valorem tax purposes constituted "unlisted property" and was therefore subject to discovery and assessment of additional taxes and penalties under G.S. 105-331. The additional amount subject to taxation was determined as follows:

Table IX

| Year | Actual Inventory in Guilford County | Amount Listed | Additional Amount Subject to Tax |
|------|------|------|------|
| 1964 | $    464,758.00 | $    399,278.00 | $     65,480.00 |
| 1965 | 1,034,066.00 | 448,101.00 | 585,965.00 |
| 1966 | 1,012,055.00 | 460,734.00 | 551,321.00 |
| 1967 | 614,604.00 | 454,801.00 | 159,803.00 |
| 1968 | 400,725.00 | 238,651.00 | 162,074.00 |
| Totals | $ 3,526,208.00 | $ 2,001,565.00 | $ 1,524,643.00 |

As noted by the Court of Appeals, the action by the State Board, in effect, sustained the assessment of the Tax Supervisor and its subsequent confirmation by Guilford County. Pursuant to the provisions of Article 33 of Chapter 143 of the General Statutes, AMP appealed from the final decision of the State Board to the Superior Court Division of the General Court of Justice for Guilford County. That court, per Judge Exum, re-

versed and vacated the final decision of the State Board on the grounds that it was not supported by competent, material and substantial evidence and was affected by errors of law. Specifically, Judge Exum found that:

1. AMP, in listing its inventories for ad valorem tax purposes with Guilford County for the years involved, "In good faith took steps to arrive at the true cash value of its inventories in each of the years in question in accordance with the provisions of G.S. 105-294, and the valuations thus determined were duly and timely listed with Guilford County."

2. AMP produced competent, material and substantial evidence to justify the ad valorem tax valuation listed by it and that there was "no competent, material and substantial evidence in the record that said valuations were understated."

3. All the competent, material and substantial evidence before the State Board was contrary to its finding that AMP's inventory figures for income and franchise tax purposes (i.e., book value) constituted the "true cash values" of said inventories for ad valorem tax purposes.

4. The conclusion of the State Board that the valuation of the inventories is to be determined by the inventory records maintained for income tax purposes (i.e., book value) was contrary to law.

5. The conclusion of the State Board that the differences between "book value" of inventories as listed for income tax purposes and the values listed by AMP on ad valorem abstracts constituted unlisted property and was subject to discovery and assessment of additional taxes and penalties was contrary to law.

From the above judgment filed by Judge Exum on 25 January 1974, Guilford County appealed to the North Carolina Court of Appeals which, as previously noted, reversed. Thereafter, AMP's petition for certiorari to the North Carolina Court of Appeals was granted by order of this Court on 4 February 1975.

Other facts pertinent to decision, including the grounds for the determination by the Court of Appeals, will be set forth in the opinion.

In re Appeal of Amp, Inc.

*Adams, Kleemeier, Hagan, Hannah & Fouts, by William J. Adams, Jr., Robert G. Baynes and Paul H. Livingston, Jr., for petitioner appellant.*

*W. B. Trevorrow, Guilford County Attorney, and William L. Daisy, Assistant Guilford County Attorney, for respondent appellee.*

COPELAND, Justice.

This controversy involves two drastically differing methods for valuing AMP's *in-process* and *raw material* inventories on hand as of 1 January for the years 1964 through 1968, inclusive. There is apparently no controversy as to the proper standard for valuing AMP's *finished goods* inventory as of 1 January 1964 and 1965 (AMP had no such inventory on hand on 1 January 1966, 1967 and 1968), since AMP readily concedes that the "book value" of such goods is equivalent to their "true value in money." As to the former, however, AMP takes the position that since it can only sell its *in-process* and *raw material* inventories to its suppliers of brass and copper, the only "true value in money" of these inventories is their "scrap value." On the other hand, Guilford County takes the position that the "true value in money" of these same inventories on the relevant dates is their "book value" as listed by AMP on its North Carolina corporate and franchise tax returns. We believe that both positions are basically erroneous. However, since we are here reviewing the actions of a state administrative agency, with limited scope of review, the basic issue does not necessarily involve the relative merits or demerits of either position.

[1] The duties of the State Board are quasi-judicial in nature and require the exercise of judgment and discretion. *Albemarle Electric Membership Corp. v. Alexander*, 282 N.C. 402, 409, 192 S.E. 2d 811, 816 (1972). Upon a review of an order of the State Board (now the Property Tax Commission—*see* G.S. 105-288), the Superior Court is without authority to make findings at variance with the findings of the Board when the findings of the Board are supported by competent, material and substantial evidence. *See, e.g., Albemarle Electric Membership Corp. v. Alexander, supra; In re Reeves Broadcasting Corp.*, 273 N.C. 571, 160 S.E. 2d 728 (1968) ; *In re Property of Pine Raleigh Corp.*, 258 N.C. 398, 128 S.E. 2d 855 (1963). G.S. 143-315 (now G.S. 150A-51 effective 1 February 1976), in defining the

scope of review and power of the court in disposing of decisions of certain administrative agencies (including the State Board), provides:

> "The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional provisions; or
>
> (2) In excess of the statutory authority or jurisdiction of the agency; or
>
> (3) Made upon unlawful procedure; or
>
> (4) Affected by other error of law; or
>
> (5) Unsupported by competent, material, and substantial evidence in view of the entire record as submitted; or
>
> (6) Arbitrary or capricious."

Accordingly, applying the above stated rules to the instant case, the basic issue for determination is whether the decision of the State Board was supported by "competent, material, and substantial evidence." In deciding this issue, it is clear that no court of the General Courts of Justice can weigh the evidence presented to the State Board and substitute its evaluation of the evidence for that of the Board. *See, e.g., Clark Equipment Co. v. Johnson,* 261 N.C. 269, 134 S.E. 2d 327 (1964).

[2] It is also a sound and a fundamental principle of law in this State that ad valorem tax assessments are presumed to be correct. *See, e.g., Albemarle Electric Membership Corp. v. Alexander, supra. See also* 7 Strong, N.C. Index 2d, Taxation § 25 (1968). "All presumptions are in favor of the correctness of tax assessments. The good faith of tax assessors and the validity of their actions are presumed." 72 Am. Jur. 2d State and Local Taxation § 713 (1974). *See also* 84 C.J.S. Taxation § 557 (1954). As a result of this presumption, when such assessments are attacked or challenged, the burden of proof is on the taxpayer to show that the assessment was erroneous. *See* 72 Am. Jur. 2d State and Local Taxation, *supra. Accord, Albemarle Electric Membership Corp. v. Alexander, supra,* 282 N.C. at 409-10, 192 S.E. 2d at 816.

In re Appeal of Amp, Inc.

The purpose underlying this presumption of correctness arises out of the obvious futility of allowing a taxpayer to fix the final value of his property for purposes of ad valorem taxation. *See* Brandis, Listing and Assessing of Property for County and City Taxes in North Carolina 108, *cited in Albemarle Electric Membership Corp. v. Alexander,* 282 N.C. at 410, 192 S.E. 2d at 817.

If the presumption did not attach, then every taxpayer would have unlimited freedom to challenge the valuation placed upon his property, regardless of the merit of such challenge.

[3] Of course, the presumption is only one of fact and is therefore rebuttable. But, in order for the taxpayer to rebut the presumption he must produce "competent, material and substantial" evidence that tends to show that: (1) Either the county tax supervisor used an *arbitrary method* of valuation; or (2) the county tax supervisor used an *illegal method* of valuation; AND (3) the assessment *substantially* exceeded the true value in money of the property. *See Albemarle Electric Membership Corp. v. Alexander, supra,* 282 N.C. at 410, 192 S.E. 2d at 816-17. Simply stated, it is not enough for the taxpayer to show that the means adopted by the tax supervisor were wrong, he must also show that the result arrived at is *substantially* greater than the true value in money of the property assessed, i.e., that the valuation was *unreasonably high. Id.* The Court of Appeals held that AMP failed to overcome this burden. 23 N.C. App. at 571, 210 S.E. 2d at 67-68. For the reasons hereinafter set forth, we agree.

I

We find nothing in this record tending to show that the county tax supervisor employed an "arbitrary" method of valuation. *But see In re Carolina Quality Block Co.,* 270 N.C. 765, 155 S.E. 2d 263 (1967).

On the other hand, the record clearly shows that the county tax supervisor used an "illegal" method of valuation. Specifically, we point to the following testimony of the witness Brooks (Guilford Tax Supervisor) on cross-examination:

"... The Tax Department tries to follow the Statutes as set out in the North Carolina Machinery Act which governs the listing of ad valorem taxes. I do not know where in the General Statutes I was authorized to instruct the tax-

payer to list as property value: 'the dollar amount should come from your records such as books of account, invoices, or tax depreciation schedules.' As to the instruction, 'Determination of Assessed or Tax Value—this will be done by the Tax Supervisor using market or cash value as a basis (GS 105-294), multiplied by the assessment ratio which is set annually,' I make the assumption that the cash value of the inventory is determined by the cash value figures furnished on the State tax returns. I do not know the State's requirements for its tax returns insofar as whether they call for cash value or book value is concerned. I was with Burlington Industries as a Production Controller prior to coming with Guilford County. I was not an Accountant. I have never held a position as an Accountant. I have examined the State tax returns of other taxpayers. I am not familiar with the requirements of the State. There is no difference between the reporting on the State corporate income tax returns, income and franchise returns, and that reported on the ad valorem listings because of the cash factor, although I have personally not made any investigation to determine it.

"I heard Mr. Westphal's statement that book value is used as an item for measuring income and not value. As to whether I take exception to his statement, I think you are confusing ad valorem tax with income reporting. This is based on my assumption that State income tax reporting and County ad valorem tax reporting is on the same basis, or should be on the same basis. As I have previously stated, that is my assumption which is not based on any knowledge that I have about the State returns."

[4]    In this State there is no statutory authority that permits the county tax supervisor, as a *per se* rule, to equate "book value" with true value in money as a uniform measure of assessment for purposes of ad valorem tax valuation. *See* G.S. 105-294 (now G.S. 105-283). *See also In re McLean Trucking Co.*, 281 N.C. 375, 189 S.E. 2d 194 (1972), *rehearing denied*, 282 N.C. 156, *cert. denied*, 409 U.S. 1099 (1973). The legislative intent on this matter is crystal clear. The 1969 General Assembly specifically rejected with an unfavorable report the following proposed legislation (H. B. 631) entitled: "An Act to Amend Chapter 105 of the General Statutes to Provide for the Listing

---

In re Appeal of Amp, Inc.

---

of Inventories for Ad Valorem Tax Purposes at a valuation Consistent with Value Reported on Income Tax Returns.":

> "At the time of listing tangible personal property, each taxpayer or person, firm or corporation, whose duty it is to list property for taxation and who reports goods, wares, merchandise and other taxable personal property as inventory on an income tax return to the North Carolina Department of Revenue shall list such tangible personal property at the valuation shown on such income tax return."

Tax Supervisor Brooks "assumed" that State income tax reporting and county ad valorem tax reporting were on the same basis, *or should be on the same basis.*" This assumption was clearly erroneous. Additionally, we point out that the North Carolina General Assembly, and no one else, determines how property in this State "should" be valued for purposes of ad valorem taxation. The North Carolina General Assembly has specifically rejected a *per se* rule that would equate inventory value as reported on State tax returns with the value of such inventory as reported for purposes of ad valorem taxation. Hence, in requiring the taxpayers of Guilford County to list their property at the value reported on State tax returns (i.e., "book value"), the tax supervisor was acting contrary to the mandate of the North Carolina Machinery Act. Such procedure constituted an "illegal" method of valuation.

II

The next question presented is whether AMP produced competent, material and substantial evidence that tended to show the asssessment increasing the valuation of its inventories for the years 1964 through 1968 was substantially greater than the true value in money of the property as originally stated on its abstracts filed with the county. *See* Table II, *supra.*

In the judgment filed on 25 January 1974 Judge Exum concluded that there was "competent, material and substantial evidence in the record to justify the ad valorem tax valuations listed by" AMP in the abstracts for the years 1964 through 1968. *See* Table II, *supra.* We find nothing in the record to support such a conclusion.

The evidence before the State Board indicated that all the abstracts for the years in question were filed for the taxpayer

by the appraisal firm of Dawson, Desmond and Van Cleve. The witness Price testified that AMP procured the services of this firm because "at that time" AMP did not know how to compute the true cash value of its own inventories. Specifically, Price testified:

". . . [W]e asked the Dawson, Desmond and Van Cleve firm to evaluate true cash value for us because at that time, frankly, we did not know how to do it. We did not know how to go from book value to cash value, and I was busy with other things, other responsibilities. . . . They were qualified at that point and I was not. They knew how and I did not. So they handled it. We gave them all the necessary basic information on which they could make their determination. We did not get into a computation of true cash value, our own computation, until after Guilford County told us in 1968 that we owed them a lot of money. Frankly, that shook us up because we thought everything was fine. I was very disturbed about it. It's our policy to report correct figures and we don't like things to backfire like this. I thought Dawson, Desmond and Van Cleve was doing the job and that they had worked out all right and agreed on the listings. . . ."

The witness Price also testified that the professional appraisal firm of Dawson, Desmond and Van Cleve specialized in appraising personal property "throughout the country" and he guessed "they did the best they could" in appraising AMP's inventories during the years in question. However, Price added that after AMP learned how to appraise its own inventories following notification of the increased assessment, he came to realize that "Dawson, Desmond and Van Cleve, using their judgment in all those years, were too high except one time." See Table VII, supra.

[5] The record does not reveal one scintilla of evidence offered by AMP to substantiate the amounts reported by the Dawson firm in the abstracts filed for the years 1964 through 1968. The only explanation for the absence of such evidence was offered by the witness Price. He testified as follows:

". . . As to why the figures we have testified to are generally lower than the figures reported by Dawson, Desmond and Van Cleve, they represent many taxpayers, a broad section. Most taxpayers have raw materials that can

be used interchangeably between different manufacturers and I feel· that they failed to recognize that we could only get scrap for those materials and I didn't know it at the time. I hadn't gotten into it. They failed to recognize that our raw materials were so unique that we do get nothing but scrap for them. They used general valuation criteria and failed to take into consideration our unique position and, as I say, I did not know it at the time. I don't know that they added anything for labor or overhead. *They will never disclose exactly their method because they are giving away their trade secrets and their know-how.* I can see this one point that they didn't know that those raw materials were ·scrap value. *I don't know how they· arrived at the computation.*"

In the absence of any evidence in the record, we find error in Judge Exum's conclusion that there was competent, material and substantial evidence to justify the ad valorem valuations *listed* by AMP in the abstract forms.

### III

The next question is whether AMP offered competent, material and substantial evidence that the increased assessment "substantially exceeded" the true value in money of its inventories as such inventory values were computed ·by AMP *subsequent to notification of the assessment. See* Tables VII and VIII, *supra.* Judge Exum concluded that AMP had met its burden in this regard. For the reasons hereinafter stated, we believe this conclusion was erroneous.

Initially, it is important to note that the inventories involved do not include *finished goods* (except for the years 1964 and 1965), but are exclusively inventories of *non-defective in-process items* and of *undamaged raw materials.* Accordingly, all references hereinafter made to AMP's "inventories" are to be understood, except where qualified, as being limited to such *raw materials* and *goods in-process.*

The only evidence offered by AMP as to the "true value in money" of these inventories was the testimony given by Messrs. Herbert Cole, George Beck, and Ernest L. Price, all officers employed by AMP. These witnesses, through their combined testimony, asserted that all of AMP's inventories constituted "scrap" so far as "true value in money" was concerned. All of this testimony was designed to support AMP's theory that the

only value its inventories had was scrap value. AMP's desired interpretation of G.S. 105-294 (now G.S. 105-283) is based on the assumption, obviously fictional, that on 1 January of each year it is required to sell all of its inventory, whether such inventory is in raw material or in an in-process state, to the only possible buyers of such materials, the scrap mills.

G.S. 105-294 (now G.S. 105-283) provides, in pertinent part, as follows:

"All property, real and personal, shall as far as practicable be appraised or valued at its true value in money. *The intent and purpose of this section is to have all property and subjects of taxation appraised at their true and actual value in money, in such manner as such property and subjects of taxation are usually sold, but not by forced sale thereof;* and the words 'market value,' 'true value,' or 'cash value,' whenever used in this chapter, shall be held to mean for the amount of cash or receivables the property and subjects can be transmuted into when sold in such manner as such property and subjects are usually sold." (Emphasis supplied.)

Our interpretation of G.S. 105-294 is in complete accord with the following taken from the opinion of the North Carolina Court of Appeals:

"The important provision of G.S. 105-294 is the requirement that property is to be appraised at its true and actual value in money, in such manner as such property is usually sold, but not by forced sale thereof. We believe that the best and most reasonable test of true value in money, in such manner as such property is usually sold, but not by forced sale thereof, is the price estimated in terms of money at which the property would change hands between a willing and financially able buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of all the uses to which the property is adapted and for which it is capable of being used. The present statute, G.S. 105-283, effective January 1, 1974, adopts such a test." 23 N.C. App. at 568, 210 S.E. 2d at 65.*

*We point out that the present statute was effective as of 1 July 1971, the date the General Assembly ratified Chapter 806, 1971 Session Laws. The 1973 amendment, effective 1 Jan-

uary 1974, and referred to by the Court of Appeals, had no relation to the statutory test for determining true value in money. *See* Section 11, Chapter 695, 1973 Session Laws.

In applying our interpretation of G.S. 105-294 to the instant fact situation, it is necessary to separately analyze the following three distinct types of property that constituted all of AMP's inventories (with the exception of finished goods) on the relevant valuation dates.

## A. SCRAP METAL AND DAMAGED RAW MATERIAL.

The evidence before the State Board tended to show that AMP's Greensboro plant generated substantial amounts of scrap metal during the course of a normal work week. For example, the witness Cole testified that the slitting, pancaking, stamping and metal plating processes all produced substantial amounts of scrap. Also, Cole pointed out that when a coil of brass or copper (raw material) was damaged during one of the various "handling" operations (e.g., if a coil was dropped, the impact would dent the metal edges) it became useless since such a damaged coil could not be processed through the forming dies. It appears, however, that the vast majority of scrap resulted from numerous malfunctions occurring during the manufacturing process, i.e., the slitting, pancaking, etc.

The witness Beck testified that during the years 1964 through 1968 approximately one-half of every pound of raw material received at AMP's Greensboro plant was reduced to scrap from all of the above listed causes. He further testified that the mills supplying AMP with this raw material regularly repurchased this scrap at published prices roughly equivalent to 40% of initial raw material costs.

[6] Under G.S. 105-294 all property must be appraised at its "true value in money," which is defined to mean "the amount of cash or receivables the property and subjects can be transmuted into *when sold in such manner as such property and subjects are usually sold.*" As to the approximately 40,000 pounds of brass and copper scrap accumulated by AMP during the course of a normal week of operations, we believe the "scrap prices" offered by the supplying mills, to whom such scrap was "usually" and "freely" sold by AMP, would be equivalent to the "true value in money" of such material for purposes of ad valorem taxation. Therefore, if Guilford County had attempted to assess this property at "book value" then it is clear that AMP

produced sufficient evidence to show that such assessment "substantially exceeded the true value in money" of this property. But, as previously noted, there is no evidence in this record that AMP's inventories on 1 January of the pertinent years included any of these type properties, i.e., true scrap metals. Perhaps AMP had no such property on hand at these dates because it regularly shipped out the accumulated scrap each week. Therefore, the fact that AMP carried its burden of proof as to this property is of no consequence. Even if AMP had had such inventories on hand, its value, as compared to the other inventories, would be insignificant, since AMP never allowed over 40,000 pounds of scrap to accumulate at its Greensboro plant.

## B. NON-DEFECTIVE IN-PROCESS INVENTORY.

[7] In the hearing before the State Board, AMP contended that this property should likewise be valued with reference to the "scrap prices" since it supplying mills provided the only possible market for these materials. We find no merit whatsoever in this argument.

As to this type of inventory, the record is totally devoid of any evidence that AMP "usually" and "freely" sold such materials back to its supplier for scrap prices. In fact, the evidence is that AMP NEVER made such sales. In this connection, AMP's taxation expert, Mr. Westphal, stated that, with the exception of scrap metal, AMP did not "usually" sell its in-process inventory. Westphal added that he knew of "almost no firms that did so." It is obvious that no on-going business entity would adopt such a sales plan. It would be ridiculous to do so.

Of course, AMP does not seriously contend that it would sell its entire in-process inventory at scrap prices. On the contrary, AMP argues that since none of its customers will buy uncompleted in-process goods it can only realize scrap value from the sale of such items. However, it is clear that AMP is an on-going business entity and plans to complete all goods in-process. Implicit in the language and in our interpretation of G.S. 105-294 is the on-going entity assumption. Therefore, AMP's position that it is not assigning a "going concern value" to its in-process inventory, but instead is assigning a "scrap value," contradicts both the letter and the spirit of the statutes. G.S. 105-294 expressly states that *"true value in money" is not to be arrived at by a forced sale of the property.* It is clear that

the statutory concept of "true value in money" is NOT equivalent to the cash realizable by a forced sale. Even AMP's tax expert conceded that under G.S. 105-294 a forced sale would not measure the true value in money of the *in-process inventory*. Specifically, he stated:

> "The statute you referred to [G.S. 105-294] seems to me to speak clearly and unmistakably of cash value, the cash into which these subjects, these properties, might be transmuted at that specific date if sold, *not on a forced sale basis, but in an orderly manner following the general procedures of the firm, the manner in which property in that condition is sold, and this I think is what we are determing here.*" (Emphasis supplied.)

Accordingly, since all of AMP's evidence before the State Board was based on the theory that the only valuation that could be placed on its *in-process inventory* was scrap value, we find that AMP failed to produce the requisite evidence sufficient to show that the assessment "substantially exceeded the true value in money" of this property. AMP failed to carry the burden imposed upon it.

It must be conceded that there is no market for AMP's *non-defective in-process inventory* other than the scrap market, which we have determined to be wholly unsatisfactory for purposes of determining ad valorem valuations. However, the mere fact that there is no market for a particular property does not deprive it of "market value," "true value," or "cash value." Market value can be constructed of elements other than sales in the market place. *See, e.g., Albemarle Electric Membership Corp. v. Alexander, supra. See generally* D. Dobbs, Remedies 390-99 (West 1973) (hereinafter cited as *Dobbs*).

For instance, it frequently becomes necessary to determine the value of corporate stock for the purpose of computing federal estate tax, state inheritance tax, and state intangible tax. In a closed corporation, where there are few stockholders, there is generally no existing market that can be used for this purpose. Yet, the fact that such corporate stock is not regularly traded on a market does not render it virtually valueless. In this situation, the stock is valued by trying to determine what an investor would pay for it by capitalizing the earnings from the corporate property; by determining the book value of the stock, deducible from the corporate balance sheet; or by considering

the financial status of the corporation with regard to its capital, surplus and undivided profits. *See generally* C. Lowndes and R. Kramer, Federal Estate and Gift Taxes 418-91 (West 1962). Stock value can also be computed by determining what it would cost to reproduce the corporate property at the time of valuation, i.e., reproduction costs. *Id. See also* 72 Am. Jur. 2d State and Local Taxation § 757 (1974).

This same principle has also been applied by the courts to the measure of damages for the loss of personal property having no market value. *See, e.g.,* Annot., 12 A.L.R. 2d 902 (1950). "Where there is the destruction of personal property without a market value, it does not mean the property is valueless and that damages cannot be recovered by the [owner]." *Rhoades, Inc. v. United Airlines, Inc.,* 224 F. Supp. 341, 344 (W.D. Pa. 1963), *aff'd,* 340 F. 2d 481 (3d Cir. 1965). In these cases where there is no market price that will fairly compensate the owner for damage to or destruction of his goods, the following factors have been considered in determining value: (1) The original cost, or cost of labor and materials; (2) the earnings the property has produced or is likely to produce if it is of commercial value, provided the earnings are reasonably likely to continue or that they are reasonably close in point of time; and, most commonly, (3) the cost of repair or replacement with a deduction for depreciation where goods are replaced. *See* Dobbs, *supra,* at 390-91.

Cost of replacement or repair, with suitable adjustments for the fact that the damaged or destroyed property was old and had depreciated in value, is perhaps, as previously noted, the most commonly considered factor in fixing value of personal property that has no market. *See* Dobbs, *supra,* at 392. *See generally* Annot., 12 A.L.R. 2d, *supra,* at 923-29. The usual formula employed for determining the value of the destroyed property in such cases deducts the accrued depreciation on the damaged property from the replacement costs. *See* Dobbs, *supra,* at 392.

In some of these cases, however, in addition to no effective market, there is also no standard cost for repairs or replacement. Professor Dobbs demonstrates the problem as follows:

". . . This [no market plus no standard cost for repairs or replacement] is notably true where property of a public utility, such as an electric power company is damaged. The public utility may replace a damaged power pole

that has been in the ground for 30 years. For its account-
ing purposes such poles have an estimated life of 40 years.
. . . But individual poles may last much longer than 40
years (or less), and the 40 year figure is only an average.
It is quite possible that the company would not have had
to replace the pole for another fifty years, or, because of
technical changes like underground conduits, that it would
never have had to replace it at all." Dobbs, *supra*, at 393.

On facts similar to those described by Professor Dobbs,
courts have differed about depreciation. In *New Jersey Power
& Light Co. v. Mabee*, 41 N.J. 439, 197 A. 2d 194 (1964), the
court took the position that the power company should recover
the full cost of replacement without deduction for depreciation
at all. The court stated: "[W]e cannot say with reasonable
assurance that the installation of a new pole did more than
remedy the wrong done. An injured party should not be re-
quired to lay out money, as defendants' approach would require,
upon a questionable assumption that one day its worth will be
recaptured." *Id*. at 442, 197 A. 2d at 196.

Our Court, relying on *Mabee*, took a similar view in *Caro-
lina Power & Light Co. v. Paul*, 261 N.C. 710, 136 S.E. 2d 103
(1964). In that case, in an opinion by Justice Higgins, this
Court stated:

"North Carolina is committed to the general rule that
the measure of damages for injury to personal property
is the difference between the market value of the damaged
property immediately before and immediately after the
injury. The purpose of the rule is to pay the owner for
his loss. If the damaged article has market value, the appli-
cation of the before and after rule is relatively simple.
Even in that case, however, the cost of repairs is some
evidence of the extent of the damage. [Citation omitted.]
However, if there is no market, there can be no market
value. The foundation for the before and after rule is lack-
ing. Cost of repairs is then about the only available evidence
of the extent of the loss. Ordinarily, power systems are
not on the market. Less so are small component parts of the
system." *Id*. at 710-11, 136 S.E. 2d at 104.

We think that the principles employed in the above cited
damage cases and stock valuation cases can be properly applied
to our problem. Therefore, in determining the true value in

money of AMP's non-defective in-process inventory, we believe that the proper valuation standard would be the cost of replacing the inventory, plus labor and overhead. In terms of a formula, this equals replacement cost plus labor and overhead.

## C. NON-DAMAGED RAW MATERIAL INVENTORY.

[8]   The witness Price testified on examination by the State Board that the raw material inventory was valued at scrap because "[t]here are no other manufacturers of similar products who would buy these [coils of brass and copper] substantially at cost, because we have a very peculiar product. It is highly engineered and specifications of those materials are not like cotton or textiles. We have a very special raw material with a very special type of specification and *generally speaking* no one else can use them because they are made for our specific product." (Emphasis supplied.)

Based on the above, AMP contended that this inventory only had a true value in money equivalent to its scrap value. If this proposition was untenable as to *non-defective in-process inventory*, which we have found to be the case, then it is likewise untenable here. If anything, AMP's argument as to *raw material inventory* is even weaker since this inventory is readily distinguishable from the *in-process* type. In fact, there is no evidence in the record that AMP changed this *non-damaged raw material* in any way subsequent to its receipt. AMP contends that because it is a "specialized" raw material, *generally speaking*, no one else can use it. But surely there are other electronic manufacturing firms or other firms using brass and copper, that could use these undamaged brass and copper coils. Even the witness Price seems to concede this point when he qualifies his statement by the phrase "generally speaking."

It is ludicrous to assert that this property, the undamaged raw materials, which constituted approximately 82% of all the taxable property on hand on 1 January 1966, 1967 and 1968, lost approximately sixty percent of its value upon being transferred from the delivery truck into AMP's warehouse facilities. AMP asked the State Board to believe that for each $10,000.00 of raw materials it purchased, said materials automatically lost $6,000.00 in value upon being placed in its warehouse. Such a contention defies all logic and common sense.

AMP contended that its non-defective *in-process* inventory had a scrap value because none of its customers would purchase

totally worthless electronic terminals. Based on this assumption, AMP argued that the only other market for purposes of ad valorem valuation consisted of the scrap mills. We found that market to be wholly unsatisfactory for such purposes. In a like manner, we find the scrap market totally unsatisfactory for purposes of valuing the raw material inventory.

For the above stated reasons, we believe that the true value in money of AMP's non-damaged raw material inventory would be equivalent to the cost of replacing such inventory on the critical date. Thus, as to this inventory, we also find that AMP failed to meet its burden.

### IV

[9] The next issue for decision is whether there was any competent, material and substantial evidence before the State Board to support the finding that the valuations imposed by Guilford County constituted the true value in money of AMP's inventories as that term is defined in G.S. 105-294.

As we have previously pointed out, there is no statutory authority in North Carolina that permits a county tax supervisor, as a *per se* rule, to equate the "book value" of property as listed on the taxpayer's North Carolina income tax return with the true value in money of such property for purposes of ad valorem taxation. But, it does not necessarily follow from the above statement that *book value* can never be an adequate measure of the true value in money or property, i.e., business inventories. Whether the county used the correct *method* of computing ad valorem valuation is not the determinative issue. "Of more importance than the method used in determining the valuation is the result reached." *Newberry Mills, Inc. v. Dawkins*, 259 S.C. 7, 15, 190 S.E. 2d 503, 507 (1972), *quoted with approval in Albemarle Electric Membership Corp. v. Alexander, supra.*

The "book values" used by Guilford County as *indicia* of market value in this case were based upon AMP's own figures furnished to the State of North Carolina for income and franchise tax purposes. AMP defines "book value" to be "the lower of cost or market." Simple logic establishes, therefore, that "book value," as defined by AMP, cannot be higher than market value. Thus, "book value" *in this case* is necessarily a measure of market value, or at least of a figure no higher than market value.

---

In re Appeal of Amp, Inc.

---

AMP's use of the "lower of market or cost" formula in determining inventory values is necessarily related to federal income taxation. Internal Revenue Code section 471 permits use of inventories taken on such basis as conforms "as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income." Pursuant to the statute, Regulation No. 1-471-2 (c) provides: "The basis of valuation most commonly used by business concerns and which meet the requirements of section 471 are (1) cost and (2) cost or market, whichever is lower."

The witness Westphal described AMP's accounting system as to how book value was computed as follows:

"In the case of lower of cost or market method, one undertakes to determine what the raw materials would cost the taxpayer at the valuation date if purchased in the quantities in which he usually purchases such material. There is added to that at the various levels of process what may be determined to be the reproduction cost to bring it up to that level. And the same is true with the finished goods. So with the lower of cost or market you are determining how much on the valuation date it would cost you to replace that inventory in that condition."

It is apparent that AMP's accounting procedures are structured so as to define and compute "book value" as replacement cost plus labor and overhead. This accounting method is in complete accord with what we have previously stated to be the proper standard for valuing AMP's non-defective in-process and non-damaged raw material inventories. Hence, it follows that the State Board's finding *in this particular case* that "book value" is evidence of "true value in money" for ad valorem tax purposes was based on sufficiently competent, material and substantial evidence and was not contrary to law. We therefore find no error in this finding by the Board.

## V

[10] Finally, there is no doubt that the differences between the total values originally listed by AMP on the abstracts and the values found by the State Board to be the true value in money of AMP's inventories constituted discoverable property under G.S. 105-331. In the recent case of *In re Strong Tire Service,*

*Inc.*, 281 N.C. 293, 188 S.E. 2d 306 (1972), this Court, in an opinion by Chief Justice Bobbitt, stated:

> "The abstract form permitted taxpayer to list its inventories in bulk [as was the situation with the instant case]. Since neither itemization nor identification was required, the extent or 'Amount' of taxpayer's inventory was shown only by the figure entered under the word 'Total.' Thus, taxpayer was permitted to identify and list its inventories by value rather than by description. In the absence of special circumstances, it was contemplated that the reported value of the inventory would be its value as shown by taxpayer's records.

> \* \* \* \* \* \* \*

> ". . . Taxpayer's contention that in each of the years 1963-68 it listed its entire inventories for ad valorem taxation is unimpressive. When inventories are identified and listed only by value, gross understatement of value is evidence that not *all* of taxpayer's inventories were listed.

> "We think the evidence was sufficient to support the State Board's finding . . . that taxpayer 'failed to list that portion of its inventory represented by the difference between the amount shown by its records and the amount reported to Guilford County as inventory,' and that taxpayer 'filed the abstracts with full knowledge that they did not accurately reflect its inventories' for the years 1963-68." *Id.* at 298-99, 188 S.E. 2d at 309-10.

We believe that *In re Strong Tire Service* fully answers the arguments advanced by AMP in this case. Hence, it would serve no useful purpose to discuss this matter at further length.

Accordingly, for the reasons we have stated herein, the judgment of the North Carolina Court of Appeals is

Affirmed.

Justice EXUM did not participate in the consideration or decision of this case.

Justice LAKE dissents.