IN THE MATTER OF: THE APPEAL OF WILLIAM H. McELWEE, JR., WILLIAM H. McELWEE, III, ELIZABETH McELWEE CANNON, DOROTHY PLONK McELWEE AND JOHN PLONK McELWEE; R.B. JOHNSTON AND SONS; AND PAUL OSBORNE and PRESLEY E. BROWN LUMBER COMPANY FROM THE VALUATION OF CERTAIN OF THEIR PROPERTIES BY WILKES COUNTY FOR 1977

No. 8010PTC649

(Filed 17 March 1981)

1. Taxation § 25.4— ad valorem taxes – sufficiency of newspaper notice of schedules

Notice published in a newspaper on 26 September 1974 that schedules for the revaluation of property in the county, which would be effective as of 1 January 1977, had been adopted by the county commissioners on 24 September 1974 and were available for inspection for a period of ten days met the requirement of G.S. 105-317(c) and did not violate due process.

---

In re McElwee

2. **Taxation § 25.4– appraisal of property for ad valorem taxes – whole record test**
    Although appraisers failed to visit or observe petitioners' property in appraising it for ad valorem taxation, there was no showing that the appraisal substantially exceeded the true value in money of the property, and the record as a whole supported a determination by the Property Tax Commission that the highest and best use of the property is its present use for growing timber, that the market value and use value should therefore be the same, and that it was properly valued as forest land at $100 per acre.

    Judge WELLS dissenting.

APPEAL by petitioners from an Order of the North Carolina Property Tax Commission entered 26 October 1979. Heard in the Court of Appeals 3 February 1981.

In accordance with G.S. 105-286, a reappraisal of all land within Wilkes County was conducted during 1974. The appraisal became effective 1 January 1977.

As provided by G.S. 105-299, the county contracted with a professional, the Allen Appraisal Company, to carry out the reappraisal. Allen developed a plan which, pursuant to G.S. 105-277.6, established a schedule for the present use value of qualifying agricultural, horticultural and forest lands.

Normally, the fair market value and use value schedules differ, with the use schedule being the lower of the two, but in this instance the two schedules were the same. Both schedules provided for the appraisal of forest land as follows:

| Good | — $300/acre |
| Fair | — $200/acre |
| Poor | — $100/acre |
| Wasteland | — $ 50/acre |

The schedules along with standards and rules that had been established were reviewed and approved by the Wilkes County commissioners on 26 September 1974. On the same day the following notice was published in a county newspaper, the *Journal Patriot:*

NOTICE

Schedules, standards and rules for the next revaluation of Wilkes County were approved by the Board of County Commissioners in regular meeting, September 24, 1974. They

are open to examination by any property owner of the County at the Office of the Tax Supervisor for a period of 10 days.

Petitioners are owners of large boundaries of timberland in Wilkes County. Their land was valued at $100 per acre under the new plan. Petitioners were not satisfied with the valuation and filed a complaint with the Wilkes County Board of Equalization and Review. The Board upheld the valuation, and petitioners appealed to the North Carolina Property Tax Commission. Petitioners contended that the use value schedule was improperly adopted. They further contended before the Commission that an income approach, which would result in a per acre use value of only $30 to $40, should have been adopted.

The Commission conducted a hearing and made findings of fact which show substantially that the lands involved are timberlands which highest and best use is their present use; that the land is poor for timber production and would only have gross annual yield of $30-$40 per acre; that timberland sales in the area between 1974 and 1978 ranged from $93 to $357; that no challenge to the use schedule had been made by petitioners during the 30-day period provided by G.S. 105-317; that although petitioners had relied on the income approach to reach their estimate of $30-$40 per acre, they had introduced no specific evidence to support the gross income figures, expense figures or capitalization rate; and further that petitioners had introduced no evidence of timberland sales that would support their $30-$40 figure.

From the facts, the Commission concluded that the highest and best use of the property is that for which it was being used (growing timber); that the market value and use value should therefore be the same; that petitioners in arriving at their $30-$40 figure had failed to understand the meaning of "present use value," as that term is defined in G.S. 105-277.2; that the county had complied with G.S. 105-317 in the adoption of the use schedules; and that after the 30-day period for challenge has expired, appeals must be based on the application of the schedules rather than the schedules themselves. The Commission sustained the county's appraisal, and the taxpayers appealed.

*McElwee, Hall, McElwee & Cannon, by W.H. McElwee and William H. McElwee III, for petitioner appellants.*

*Brewer & Freeman, by Joe O. Brewer and Paul W. Freeman Jr., for respondent appellee.*

HILL, Judge.

Here, we review the acts of the North Carolina Property Tax Commission, a state administrative agency, to determine whether the evidence presented to the Commission supported its conclusions. In reviewing the orders of state agencies, this Court may not make findings of fact contrary to the Commission when the findings of the Commission are supported by "competent, material, and substantial evidence." *In re Appeal of Amp, Inc.,* 287 N.C. 547, 561, 215 S.E. 2d 752 (1975); *In re Land and Mineral Company* (Filed 2 December 1980).

G.S. 150A-51 specifies the scope of review and the power of courts in disposing of cases appealed from state agencies and is to be read in conjunction with *In re Appeal of Amp, Inc., supra.*

That statute provides in part:

> The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the agency findings, inferences, conclusions, or decisions are:
>
> . . . . . . . . .
>
> (5) Unsupported by substantial evidence admissible under G.S. 150A-29(a) or G.S. 150A-30 in view of the entire record as submitted; or
>
> (6) Arbitrary or capricious.

When we consider the judicial rule of *Amp,* together with G.S. 150A-51, the standard of review we must apply is whether the decision of the Commission is supported by "competent, material, and substantial evidence." The scope of judicial review is the "whole record" test. *Thompson v. Board of Education,* 292 N.C. 406, 233 S.E. 2d 538 (1977). In reviewing the commissioners' decision, we must keep in mind the principle of law that ad valorem tax assessments are presumed to be correct. *See In re Appeal of Amp, Inc., supra; Electric Membership Corp. v. Alexander,* 282 N.C. 402, 192 S.E. 2d 811 (1972); *In re Land and*

*Mineral Company, supra.* The presumption places the burden of proof that the assessments are incorrect on the taxpayer.

Justice Copeland has set forth a two-pronged test the Court must apply in determining whether the taxpayer has overcome that presumption.

> [I]n order for the taxpayer to rebut the presumption he must produce 'competent, material and substantial' evidence that tends to show that: (1) Either the county tax supervisor used an *arbitrary method* of valuation; or (2) the county tax supervisor used an *illegal method* of valuation; AND (3) the assessment *substantially* exceeded the true value in money of the property. *See Albemarle Electric Membership Corp. v. Alexander, supra,* 282 N.C. 410, 192 S.E. 2d at 816-17. Simply stated, it is not enough for the taxpayer to show that the means adopted by the tax supervisor were wrong, he must also show that the result arrived at is *substantially* greater than the true value in money of the property assessed, i.e., that the valuation was *unreasonably high. Id.* . . .

*Amp, supra,* at p. 563.

[1] Petitioners first assign as error the Commission's failure to conclude as a matter of law that the notice published in the *Journal Patriot* on 26 September 1974 violated their due process rights as guaranteed by the state and federal constitutions; further violated G.S. 105-317; and thus was void. Petitioners contend the notice failed to inform them, as well as other interested property owners, that schedules which affected their property had been adopted and were available for inspection.

G.S. 105-317(c) states:

> (c) The schedules of values, standards, and rules required by (b)(1) above shall be reviewed and approved by the board of county commissioners before they are used. When the board of county commissioners approves the schedules, standards and rules, it shall issue an order adopting them and shall cause a copy of the order to be published in the form of a notice in a newspaper having a general circulation in the county, stating in the notice that the schedules, standards, and rules to be used in the next scheduled reappraisal of real property have been adopted

and that they are open to examination by any property owner of the county at the office of the tax supervisor for a period of 10 days from the date of publication of the notice.

In the present case, the schedules were adopted 24 September 1974, and a notice announcing their adoption was published 26 September 1974. The schedule and notice related to reappraisals that would be effective as of 1 January 1977. We agree with petitioners that the schedules were established far in advance of the effective date of the reappraisal and that the county made only token efforts to inform property owners that the schedules had been adopted. The statute, however, does not set a time frame or a minimum size for the notice, and the notice meets each requirement set forth in the statute. After applying the proper standard and scope of review, we find that the Commission properly concluded that the county complied with G.S. 105-317.

Furthermore, we find that the notice was not violative of due process. Appellee cites *Brock v. Property Tax Comm.*, 29 N.C. App. 324, 224 S.E. 2d 295 (1976), *reversed and remanded*, 290 N.C. 731, 228 S.E. 2d 254 (1976), as a case which deals with a published notice remarkably similar to the one before us. In *Brock*, although both appellate courts upheld the sufficiency of the notice, neither court expressly dealt with the adequacy of the size of the notice or its timing. It is established, however, that "only when the action of the ... authorities is found to be arbitrary [will] the courts interfere with assessments on the asserted violation of the due process clause." *Hotel Co. v. Morris*, 205 N.C. 484, 487, 171 S.E. 779 (1933). We do not believe the action of the county in printing the notice in the manner it did and at the time it did was arbitrary so as to make the notice void. Petitioners' assignment of error is without merit and overruled.

[2] We next address the remaining assignments of error brought forth by the petitioners as a class and apply the two-pronged test set out in *Amp., supra*. When we administer the "whole record" test to the facts set out in the record, we find some irregularity; i.e., the appraisers failed to visit or observe the property in making the appraisal. Nevertheless, the second prong of the test — i.e., whether the assessment substantially

---

**In re McElwee**

---

exceeded the true value in money of the property — is not violated.

The appraiser in preparing the use value schedule divided the county property into classifications, assigning a different value based on productivity, soil classification, and location. The tax supervisor valued the land in question in the lowest production classification.

There was evidence in the record supporting a use value as low as $30 and as high as $100 — the result of a difference of opinion among experts. When we apply the facts to the standard and scope of review set out above, we conclude the decision of the Property Tax Commission should be

Affirmed.

Judge ARNOLD concurs.

Judge WELLS dissents.

Judge WELLS dissenting:

I believe that the final decision of the Property Tax Commission must be reversed because it is affected by a manifest error of law. *See* G.S. 150A-51(4). If the decision of the Commission is allowed to stand, the sensible and salutary policies underlying G.S. 105-277.2 through 105-277.6, establishing classifications for ad valorem taxes on agricultural and forestland, will be defeated. Generally, real property is taxed at its true value. G.S. 105-317. In finding the true value for purposes of appraisal, various factors may be considered:

§105-317. Appraisal of real property; adoption of schedules, standards, and rules. — (a) Whenever any real property is appraised it shall be the duty of the persons making appraisals:

(1) In determining the true value of land, to consider as to each tract, parcel, or lot separately listed at least its advantages and disadvantages as to location; zoning; quality of soil; waterpower; water privileges; mineral, quarry, or other valuable deposits; fertility; adaptability for agricultural, timber-producing, commercial, industrial, or other uses; past income; probable future income; and any

other factors that may affect its value except growing crops of a seasonal or annual nature.

. . . .

By establishing the special classification as to farm, horticultural, and forestlands, G.S. 105-277.3, the General Assembly provided the means for these lands to become eligible for appraisal on a special basis, whereby present use becomes the standard, avoiding appraisal on the factors of general application set out in G.S. 105-317(a)(1). We quote in pertinent part:

§ 105-277.4. Agricultural, horticultural and forestland — application for taxation at present-use value. — (a) Property coming within one of the classes defined in G.S. 105-277.3 but having a greater value for other uses shall be eligible for taxation on the basis of the value of the property in its present use if a timely and proper application is filed with the tax supervisor of the county in which the property is located. The application shall clearly show that the property comes within one of the classes and shall also contain any other relevant information required by the tax supervisor to properly appraise the property at its present-use value. . . .

(b) Upon receipt of a properly executed application, the tax supervisor shall appraise the property at its present-use value as established in the schedule prepared pursuant to G.S. 105-277.6(c). . . .

(c) Property meeting the conditions herein set forth shall be taxed on the basis of the value of the property for its present use. . . .

G.S. 105-277.6(c) provides in pertinent part:

(c) To insure uniform appraisal of the classes of property herein defined in each county, the tax supervisor, at the time of the general reappraisal of all real property as required by G.S. 105-286, shall also prepare a schedule of land values, standards and rules which, when properly applied, will result in the appraisal of the property at its present-use value. . . .

G.S. 105-277.2(5) establishes the criteria for finding present-use value:

    (5) "Present use value" means the price estimated in terms of money at which the property would change hands between a willing and financially able buyer and a willing seller, neither being under any compulsion to buy or to sell, assuming that both of them have reasonable knowledge of the capability of the property to produce income in its present use and that the present use of the property is its highest and best use.

Through the enactment of the foregoing statutes, the General Assembly established the means for such land to remain in its traditional use and avoid being taxed on the value of similar property sold for or devoted to other non-farming uses. The classic examples, common in our experience and observable all around us, are farms and forests existing side-by-side with residential subdivisions, resorts, shopping centers and industrial parks. If the farmer or forester wants to keep his land in agricultural production under such circumstances, the General Assembly has provided the opportunity, if not the incentive, for him to do so by establishing a special tax classification. *See generally W.R. Company v. Property Tax Comm.,* 48 N.C. App. 245, 269 S.E. 2d 636 (1980). The Commission has not correctly applied the law under the facts of this case. I quote from the Commission's decision in pertinent part as follows:

    From our review of the applicable law, the evidence and our findings of fact, we conclude and so decide that the County's appraisal of the subject land is not in excess of its forest land use value. All of the witnesses testified that although the subject land was poor timber land, its highest and best use was the commercial growing of trees. The County's appraisal is entirely consistent with this testimony. It has appraised the land for market value purposes and for use value purposes at $100 per acre. That is the figure in the County's schedules of value for poor timber land. It seems obvious to us that if the highest and best use of the property is what it is being used for, the market value and the use value should be the same figure. The $100 figure is also supported by sales of comparable properties introduced by the County. Appellants' estimates of value were developed based on general statements about stumpage value, net income and capitalization rates. . . .

No evidence was introduced to indicate that appellants would be willing sellers of any of the subject land or that they would expect to acquire any similar land for less than $100.

The thrust of the Commission's order is that market value, no matter how established, equates present use value. This result flies in the face of the clear directive of the statute to find market value by the criteria of "the capability of the property to produce income in its present use." Such a methodology does not allow substituting prices obtained for sales of comparable land as the criteria, which apparently is the position taken by the Commission. It is clear from the Commission's findings of fact that it considered both the income producing capability and sales of other timberland in reaching its conclusions. But it is clear from its conclusions that it relied on comparable sales in reaching its result. Thus, the Commission has effectively but erroneously negated the statutory scheme and directives we have discussed in this dissenting opinion.

Additionally, the notice published by the county does not meet the requirements of the statute, G.S. 105-317. The statute requires the Board of County Commissioners to publish *a copy of its order*. The notice in this case does not even purport to be a copy of the Commissioners' order. It is not signed, and nothing in its contents indicates who authorized it or required its publication. It is outstandingly lacking in official qualities. Such an informal, unofficial, and uninformative utterance published so modestly and so far in advance (27 months) of the effective date also fails, in my opinion, to comport with due process requirements.