IN THE MATTER OF: THE APPEALS OF SOUTHERN RAILWAY COMPANY
AND NORFOLK SOUTHERN RAILWAY COMPANY FROM THE VALUA-
TION OF THEIR PROPERTY BY THE NORTH CAROLINA PROPERTY
TAX COMMISSION FOR 1980

No. 8110PTC1223

(Filed 19 October 1982)

1. **Taxation § 25.10— ad valorem taxation—appraisal of railroad proper-
ty—review by Property Tax Commission**

The Property Tax Commission did not merely review appraisals of the
system properties of two railroads by the Ad Valorem Tax Division of the
Department of Revenue for errors of law but properly complied with G.S.
105-342(d) by hearing evidence from both sides, making extensive findings of
fact, and concluding that the appraisals of the railroads' system properties did
not exceed the true value in money of the properties, that the railroads did
not overcome the presumption of correctness given the appraisals, and that
the appraisals were supported by substantial competent evidence.

2. **Taxation § 25.7— ad valorem taxation—railroad property—capitalization of in-
come—adding deferred income taxes to income**

In appraising the property of two railroads for ad valorem tax purposes
by capitalizing income, the Property Tax Commission could properly establish
the income base to be capitalized by adding back to income the deferred in-
come taxes which had been charged off as expenses.

3. **Taxation § 25.7— ad valorem taxation—railroad property—capitalization of in-
come—use of last year's income**

In appraising the property of two railroads for ad valorem tax purposes
by capitalizing income, the Property Tax Commission could properly use the
last year's income as a starting point rather than an average of income for the
past five years where income for the railroads had grown steadily in each of
the past five years.

4. **Taxation § 25.7— ad valorem taxation—railroad property—capitalization of in-
come—use of actual interest rates on indebtedness**

In appraising the property of two railroads for ad valorem tax purposes
by capitalizing income, the Property Tax Commission could properly use the
interest rate expressed on the face of a credit instrument in determining in-
come rather than adjusting income to reflect the current market interest rates
on such indebtedness.

5. **Taxation § 25.7— ad valorem taxation—value of railroad property—capitaliza-
tion of income—actual return on equity capital**

In determining the value of a railroad's property by capitalizing income,
the Property Tax Commission did not err in using a rate of return on equity
capital calculated from the railroad's past earnings rather than an average rate
of return for all railroads listed in *Standard and Poor's Index*.

**6. Taxation § 25.7— ad valorem taxation—value of railroad property—deduction for non-system property—income influence factor**

In determining the amount to be deducted for non-system property in determining the true value of a railroad's system property for ad valorem taxes, the Property Tax Commission did not err in eliminating undistributed earnings of the railroad's subsidiaries from both total income and non-operating income, adding deferred income taxes back to income in making an income influence computation of 29%, excluding deferred taxes from a second computation which produced an income influence factor of 32%, and averaging those two figures to give a 30% income influence factor. G.S. 105-336(a)(1).

**7. Taxation § 25.8— ad valorem taxation—value of railroad property—consideration of cost and book value**

In determining the true value of two railroads' system properties for ad valorem tax purposes, the Property Tax Commission considered the original cost and book value of the railroads' property in accordance with the requirements of G.S. 105-336(a)(2), although it gave little weight to such factors in its determination of true value.

APPEAL by petitioners from an Order of the North Carolina Property Tax Commission entered 19 May 1981. Heard in the Court of Appeals 2 September 1982.

Southern Railway Company ("Southern") and Norfolk Southern Railway Company ("Norfolk Southern"), hereinafter called "Railroads," operate in North Carolina. As "public service companies," their property is subject to ad valorem taxation as provided in Article 23, Chapter 105 of the North Carolina General Statutes. The Railroads appeal a decision by the Property Tax Commission adopting, in substance, the appraisals for ad valorem tax purposes made by the State Department of Revenue.

*Brooks, Pierce, McLendon, Humphrey & Leonard, by L. P. McLendon, Jr. and Edward C. Winslow III; and William C. Antoine and James C. McBride; and Laughlin, Hale, Clark & Gibson, by Everett B. Gibson and Gregory G. Fletcher, for petitioner-appellants.*

*Attorney General Edmisten, by Assistant Attorney General George W. Boylan, for the State.*

HILL, Judge.

The petitioner Railroads appeal from the North Carolina Property Tax Commission's decision upholding a Department of Revenue appraisal of petitioners' property. Finding no error, we affirm.

North Carolina General Statutes § 105-283, entitled "Uniform Appraisal Standards," provides: "All property, real and personal, shall as far as practicable be appraised or valued at its true value in money. When used in this Subchapter, the words 'true value' shall be interpreted as meaning market value, that is, the price estimated in terms of money at which the property would change hands between a willing and financially able buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all the uses to which the property is adapted and for which it is capable of being used . . . ."

Railroads are "public service companies." G.S. 105-333(14). Property used in "public service company" activities (i.e., system property) is not valued piece by piece, but rather as a system or unit. G.S. 105-335(a). The Department of Revenue must use special appraisal methods to determine the value of a system. These methods, as outlined in G.S. 105-336(a), include:

(1) The market value of the company's capital stock and debt, taking into account the influence of any non-system property.

(2) The book value of the company's system property as reflected in the books of account, kept under the regulations of the appropriate federal or State regulatory agency and what it would cost to replace or reproduce the system property, less a reasonable allowance for depreciation.

(3) The gross receipts and operating income of the company.

(4) Any other factor or information that in the judgment of the Department has a bearing on the true value of the company's system property.

A careful reading of the statute reveals that all four approaches are to be used in establishing the appraised value, but no guidelines are set out establishing the weight to be given any single system of valuation. Rather, based on the judgment of the Ad Valorem Tax Division, the Department may exercise its discretion on valuation. The appraisal must not be arbitrary, must be based on substantial evidence, and must be based on lawful methods of valuation.

Recognizing the obvious futility of allowing a taxpayer to fix the final value of his property for purposes of ad valorem taxation, the State legislature has created a system of appraisal designed to establish true value and give the taxpayer and the taxing unit an opportunity to dispute the Department's valuation.

The Department of Revenue is responsible for appraising the property of public service companies. G.S. 105-335(a). Appraisals of the system are made annually by the Department's Ad Valorem Tax Division. G.S. 105-335(a). Such appraisals are deemed tentative since the appraisal is made without notice to the taxpayer or opportunity for hearing. G.S. 105-342(b). If a timely request for a hearing is not made, the tentative figures become final and conclusive twenty days after the valuation notice is mailed. If the taxpayer makes a timely request, the Property Tax Commission fixes a date and place for hearing and gives the taxpayer at least 20 days' notice.

Although the appraisal is called "tentative," it nevertheless remains in effect unless the Property Tax Commission overturns or otherwise disposes of it. The appraisals are presumed to be correct. *In re Appeal of Amp, Inc.*, 287 N.C. 547, 215 S.E. 2d 752 (1975). This presumption applies, as well, to the good faith of the tax assessors and the validity of their actions. *In re Appeal of Amp, Inc., supra. See also Electric Membership Corp. v. Alexander*, 282 N.C. 402, 192 S.E. 2d 811 (1972), in which the supreme court held that the presumption of correctness applied to official acts of the State Board of Assessment, a predecessor of the Property Tax Commission.

In structuring the Property Tax Commission under State Government Reorganization in 1973, the legislature created a quasi-judicial body, novel in its structure, to serve a specific need. The act of creation provides: "There is hereby created the Property Tax Commission with the authority to hear and decide *appeals* concerning the appraisal of property of public service companies (as defined in G.S. 105-333 . . . ." G.S. 143B-222 (emphasis added). The act of creation is implemented by G.S. 105-288(b)(2) which sets out the functions of the Commission:

> The Commission shall hear *appeals* from the *appraisal* and assessment of the property of public service companies as defined by G.S. 105-333. (Emphasis added.)

Since the appraisal, although tentative, remains in existence and is presumed to be correct, any action to set aside or modify it is an appeal which the Commission was created to hear. The legislature recognized that such appeal presented the first opportunity for a public service company to challenge an appraisal made by the Ad Valorem Tax Division. It broadened the scope of the hearing of the appeal in G.S. 105-342(d):

> *Hearing and Appeal.* — At any hearing under this section, the Property Tax Commission shall hear all evidence and affidavits offered by the taxpayer and may exercise the authority granted by G.S. 105-290(d) to obtain information pertinent to decision of the issue. The Commission shall make findings of fact and conclusions of law and issue an order embodying its decision . . . .

Our Supreme Court has said the function of the Property Tax Commission is "[t]o determine the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts and to appraise conflicting and circumstantial evidence." *In re McElwee*, 304 N.C. 68, 87, 283 S.E. 2d 115, 126 (1981).

By letter dated 4 September 1980 the Department of Revenue informed Southern that its 1980 tentative appraisal value of Southern's system property was $1,025,000,000 and apportioned $185,000,000 to North Carolina. The Department notified Norfolk Southern that its total appraisal value for the entire system was $59,500,000 and allotted $50,000,000 to North Carolina. Both railroads filed objections to the tentative appraisals. A hearing was held before the Property Tax Commission in October, 1980. The Commission heard evidence, made findings of fact, and concluded that the appraisals made by the Ad Valorem Tax Division of the Department of Revenue did not exceed the true value of the property. Railroads appeal. Specifically, Railroads divide the alleged errors into two categories discussed below: (I) errors of administrative procedure, and (II) illegal appraisal methods. We find no prejudicial error in the Commission's appraisals in either category.

## I.   QUESTIONS OF ADMINISTRATIVE PROCEDURE

[1] Railroads argue the Property Tax Commission erred in concluding that its role was to provide appellate review of the ap-

praisals made by the Ad Valorem Tax Division. Rather, Railroads contend the Commission must impartially hear evidence from both sides and reach its own conclusions about true value, not merely review the Ad Valorem Tax Division figures for errors of law. Citing G.S. 105-342(d), Railroads argue the Commission must weigh the evidence before it and reach a decision based upon proof by its greater weight. We conclude the Commission did just that: It heard detailed testimony offered by the Railroads' experts and further evidence affecting the appraisals offered by the Department of Revenue Ad Valorem Tax Division. Thereafter, it made extensive findings of fact and entered its conclusions and final order, which states, in part, as follows:

> [F]rom our review of the applicable law, the evidence and our findings of fact, we conclude as a matter of law that the Department's appraisals of the system properties of the subject railroads do not exceed the true value in money of the properties.

> It is our opinion that the appellants have not overcome the presumption of correctness given such appraisals by our Court in the *Albemarle Electric Membership Corp. v. Alexander*, 284 N.C. 402 (1972), and *Appeal of Amp, Inc.*, 287 N.C. 547 (1975) decisions and that the Department's appraisals are supported by substantial competent evidence of record . . . .

> . . . .

> . . . as a general statement, we find nothing about the Department's treatment of these items to be unreasonable or arbitrary . . . .

With the foregoing in mind, we now review the evidence before the Property Tax Commission to determine if that body's findings and conclusions are supported by competent, material, and substantial evidence in view of the whole record. We note initially that the primary data used for the appraisals by the Department and Railroads are virtually the same: Southern Railway's *1979 Annual Report to the Interstate Commerce Commission;* Southern Railway's *1979 Securities and Exchange Commission Form 10-K* (Southern Railway's *1979 Annual Report to the Shareholders* is an attachment to this form); Southern Railway's *1979 Statistical Report*, which is a supplement to its an-

nual report. The final decision of the Property Tax Commission made full and complete findings of fact. Its conclusions were couched in the language of appeal, i.e.,

[I]t is our opinion the appellants have not overcome the presumption of correctness . . . .

\* \* \* \* \* \*

Department's appraisals are supported by substantial competent evidence of record . . . .

\* \* \* \* \* \*

[W]e find nothing about the Department's treatment of these items to be unreasonable or arbitrary . . . .

Nevertheless, a reading of the decision as a whole clearly indicates it follows the requirements of G.S. 105-342(d). We conclude the findings of fact sufficiently support the conclusions, and the conclusions support the final disposition of the case.

We are not impressed with Railroads' argument that the Property Tax Commission erred in concluding that Railroads failed to rebut the "presumption of correctness" accorded the Department of Revenue appraisal. G.S. 105-273 provides:

(2) "Appraisal" means both the true value of the property and the process by which true value is ascertained.

(3) "Assessment" means both the tax value of the property and the process by which the assessment is determined.

For public service companies, the true value of property is its tax value, and "appraisal" and "assessment" are synonymous. The "presumption of correctness," although rebuttable, was not rebutted in this case. To rebut the presumption, the taxpayer must produce:

. . . 'competent, material, and substantial evidence' that tends to show that: (1) Either the county tax supervisor used an *arbitrary method* of valuation; or (2) the county tax supervisor used an *illegal method* of valuation; AND (3) the assessment *substantially* exceeded the true value in money of the property.

*In re Appeal of Amp, Inc., supra* at 563, 215 S.E. 2d at 762.

Railroads contend the Department of Revenue's appraisal methods were illegal and resulted in substantial overstatements of value. We note that witnesses for the Railroads arrived at a variant appraisal because their methods of valuation differed from those used by the Department of Revenue. The Commission, however, simply chose to believe the testimony of the witness for the Ad Valorem Tax Division as it was entitled to do under G.S. 105-342(d). The evidence before the Commission was competent and substantial and supports that body's findings, conclusions, and judgment and is sufficient to support adequately the presumption of correctness.

We do not find it necessary to review in detail evidence supporting the findings of fact, since the same basic material was used by all parties, and only in the application of valuation formulas do material differences arise. We shall discuss further the Railroads' contentions concerning appraisal methods in the remaining sections of the opinion. As to errors of administrative procedure, we find no error in the decision of the Tax Commission.

## II. QUESTIONS CONCERNING THE METHOD OF APPRAISAL

Railroads contend the Ad Valorem Tax Division of the Department of Revenue used illegal appraisal methods in arriving at "true value" or "market value." Any method of appraisal which does not tend to establish market value is an illegal method of valuation for property tax purposes. *See In re Appeal of Amp, Inc., supra.* Since the base figures used by both parties are virtually the same, we examine the application of the appraisal methods set out in the statute to these base figures to determine if errors of law exist.

### GROSS RECEIPTS AND OPERATING INCOME APPROACH

The appraisers for both the Railroads and the Department agreed that the income approach to appraisals of railroad property is the most reliable. This method determines market value by capitalizing income. The appraiser makes two basic inquiries about the system of property being assessed. First, he or she determines the normal income that the property is capable of earning on the appraisal date. Second, the appraiser determines the rate of return capital investors would demand as an induce-

ment to investment, taking into account the risks associated with that particular business as compared with competing investment opportunities. Assuming income and rate of return for a given date are known, the capital value of the business on that date is determined by capitalizing the income stream at the required rate of return. To determine the *normal* earning power of the assets, special or extraordinary items may need to be eliminated before capitalization. Likewise, the appraiser must compare the yield on investment associated with other business opportunities.

[2] The Commission adjusted the Railroads' income records by adding to income deferred income taxes which had been charged off as expenses prior to capitalization. Railroads objected, citing *Pacific Power and Light Co. v. Oregon*, 596 P. 2d 912 (Ore. 1979), as authority. This case appears to be the sole precedent at this time.

In addressing this question, we note with interest that although the net income for Southern had increased from $65,509,000 to $117,787,000 between 1975 and 1979, Southern paid income taxes in only one year during this period.

Deferred income taxes typically result from accelerated depreciation which permits larger portions of the cost of a capital asset to be depreciated during the early life of the asset, and at a smaller rate thereafter. The decision to use an accelerated method of depreciation is entirely optional with the taxpayer. The straight line method charges off the asset at a fixed annual rate over the life of the asset. Under the accelerated method, the taxpayer's taxable income is reduced during the early years in which the asset is used and increased in the later years when depreciation of the asset decreases, all other income and expenses remaining constant. To equalize the anticipated tax liability arising during the later years as income-producing property is depreciated, Railroads established a reserve for the anticipated tax and charged off income by the amount of the reserve before capitalization. This sum was added back to income by the Department in establishing the income base to be capitalized.

Railroads argue that accepted railroad accounting procedures and business practices follow the rule utilized by them; that taxes deferred by a seller have no value, and that proper analysis of income recognizes tax liability during the period in which it is ac-

crued rather than when it is paid. They contend that a potential buyer/seller would not regard deferred tax expense as income to be capitalized; that the company receives income from the cash kept in reserve, and, in effect, capitalization of the deferred tax and the income earned thereon results in an overstatement of value. Railroads further argue that, in the future, they will not have a deferred tax expense.

We find language in *Broadwell Realty Corporation v. Coble, Sec. of Revenue*, 291 N.C. 608, 615, 231 S.E. 2d 656, 660 (1977), to be persuasive:

> "[F]uture Federal Income Taxes are not an outstanding indebtedness—they are a mere contingency. The fact that a tax is certain to accrue in years to come does not make it a present debt . . . ." (Citation omitted.)

Since current income is charged to establish the reserve for deferred income taxes and simply anticipates a tax that may never become due, we conclude the Department correctly added to the income to be capitalized the deferred income tax expense.

[3] Both the Department and Railroads concede that a realistic base value must be established as the initial starting point in establishing true value under the income approach. Southern contends an average of the past five years' income should be the base value, while the Department contends only the last year's income should be used. Inasmuch as Southern's income has grown steadily from $65,509,000 to $117,787,000 [without adding the reserve for deferred income taxes] between 1975 and 1979, with no year in which the income has declined, we conclude the starting point should be the previous year's income, adjusted by adding back the reserve for deferred taxes. Our Supreme Court is aware of this problem:

> [C]onsideration of past income and probable future income clearly requires that attention be given an established declining trend in income.

*In re Valuation*, 282 N.C. 71, 78, 191 S.E. 2d 692, 697 (1972). Had the Railroads' income not increased each year, had there been years of profit and years of loss, perhaps income averaging would have been used by the Department. Since income accelerated

year after year, however, we find no error in using the preceding year's income, as adjusted.

[4] Railroads further contend the company's income must be adjusted to reflect the current market interest rates on indebtedness. Much of Railroads' indebtedness arises from bonds, trust agreements, and the like, issued years ago when the cost of interest was substantially lower than the current rate. Hence, Railroads argue that if the high current interest rates are substituted, income will be substantially lower, and the true value of the Railroads will likewise be lower. They further argue that accepted accounting principles require that the debt be restated to establish true value; that an assumable debt at a low rate increases the seller's demands for a higher down payment.

We note that an expert witness for the Railroads testified he "had a feeling that fifty per cent of the taxing jurisdictions use the current cost of debt" and "the other fifty per cent use the embedded cost of debt." The Department uses the interest rate expressed on the face of the credit instrument, i.e., the "embedded" cost of debt. To adopt Railroads' position would invite further questions, *e.g.*, What is the *current* cost of interest for *this* railroad under all the circumstances? We adopt the position that the "other fifty percent" of the taxing jurisdictions using the embedded cost of debt are correct.

[5] Railroads next assert that the Property Tax Commission erred in using, as did the Department, the actual return on equity capital rather than the current market cost for capitalization in determining value under the income approach. The appraiser's object is to determine the rate of return a potential investor would demand for the commitment of capital to purchase a railroad with the earnings of the appraised company. Railroads utilized equity rates of return for all companies listed in *Standard and Poor's Index* and calculated mean and median rates for both diversified railroads and nondiversified railroads. Railroads also considered Southern's past rate of return on equity. The Railroads' appraiser arrived at 18 percent as the cost of equity as the basis for his appraisal under this guideline. The Department used a hypothetical rate calculated from Southern's past earnings only.

Railroads argue the Department's technique will vary from year to year, based on income; that lower earnings result in lower

capitalization rates which produce a higher value. Moreover, Railroads contend that tying the base to earnings rather than market rates violates principles established by this Court in *In re Valuation, supra,* and *In re Pine Raleigh Corp.,* 258 N.C. 398, 128 S.E. 2d 855 (1963), in which the court held that market value of real estate based on rental income should be based on the fair rental value and not limited to the actual rent earned. Finally, the Railroads argue that to capitalize earnings at book rates of return simply results in book value, and that a method of appraisal which does no more than value business at book value is illegal. *In re Appeal of Amp, Inc., supra.*

The Department contends a capitalization rate of 12 percent for Southern was based upon the embedded cost of debt for its preferred stock and long term debt and a 15 percent return to common equity. Southern's capitalization rate of 15.25 percent was based upon the current cost of preferred stock and long term debt and an 18 percent return to common equity. The determination of the equity rate cannot be precisely defined. Our Supreme Court has held that calculation of an appropriate rate of return is a matter of judgment. *Electric Membership Corp. v. Alexander, supra,* at 408, 192 S.E. 2d at 815. Southern is a multimillion dollar company. Its shares of stock are traded widely on the New York Stock Exchange. The marketplace looks beyond the book value (equity) of its shares in the establishing of price. Nevertheless, book value has its place. Likewise, the marketplace values shares in other railroads with different earnings, different book values and different futures.

We conclude that the Department correctly established a value of the Southern Railroad based on the income that that particular railroad's property could generate, and not on the average rate of return for all railroads used in *Standard and Poor's Index.*

Since the calculation of an appropriate rate of return is not strictly a question of law, we deem that such appraisal was made in good faith and falls within a zone of reason. It is not arbitrary and was not arrived at illegally.

MARKET VALUE OF STOCK AND DEBT APPROACH

[6]   G.S. 105-336(a)(1) provides the appraiser shall consider "[t]he market value of the company's capital stock and debt, taking into

account the *influence of any non-system property.*" (Emphasis added.) Both parties substantially agree on their initial approach to this method of valuation, but diverge on their determination of the deduction for non-operating or non-system property. This appraisal technique operates on the premise that the true property value of a company equals the total market value of all its outstanding debt and equity securities. However, all non-system property must be eliminated to arrive at the true value of the system operation. Under the "income influence approach," the appraiser determines the ratio of non-system income to total income before fixed charges (i.e., the income available to both bondholder and stockholder), and then multiplies that ratio by the total value of the company's stock and debt. The resulting figure is the "income influence" of the non-system property. This figure is deducted from the total stock and debt value. The final figure represents the true stock and debt value for the Railroads' system property.

Appraisers for the Railroads and the Department agreed on the total value of Southern's outstanding stock and debt, but they disagreed about the proper methods for calculating the income influence deduction. The disagreement involved the computation of the non-operating income and total income to be used in the computation of the non-operating income influence ratio.

The Department eliminated, both from non-operating income and from total income, $20,666,000 that represents undistributed earnings of subsidiaries included in Southern's income.

The Department made alternative computations. In one, it added deferred income taxes back to income. This was consistent with the appraiser's prior computation of income to be capitalized under the income approach. In its other computation, the Department excluded deferred taxes. These alternative computations produced income influence percentages of 29 percent and 32 percent, which the appraiser averaged at 30 percent.

The Department appraiser made a third computation in which he eliminated nothing from reported income. This produced an income influence percentage of 45 percent. The appraiser applied this percentage to the value of the stock only—not to stock and debt as required by the statute. The resulting figure was not substantially different from the value produced by applying 30

percent to gross stock and debt: $1,083,338,000 versus $1,040,-
995,000. Railroads dispute the third computation, saying that the
Department made an error in addition. The Department contends
that the computation was made simply to check its figures using
the 30 percent factor. Assuming the third computation was error,
we find it to be harmless.

The Department argues that although dividends actually paid
by subsidiaries to Southern enhance the value of Southern's com-
mon stock, the same cannot be said about retained earnings. This
valuation method requires that possible "influence" of non-
operating property be eliminated from the current value of the
company's stock. We agree. Retained earnings of a subsidiary
have little or no effect on the value of Southern's common stock.

It is apparent that the Department used the 30 percent in-
fluence factor in arriving at a value under this approach. We find
no error.

### THE COST APPROACH TO VALUE

[7]   The Property Tax Commission concluded:

Although both appraisers calculated a cost indicator of
value for Southern, neither considered it a very reliable in-
dicator of market value. Dr. Schoenwald [for Railroads] gave
it no weight in his appraisal and the Department considered
it but gave it very little weight. The Commission recognizes
the difficulty in using book cost figures to determine the fair
market value of a railroad company because of the heavy
economic obsolescence. We believe, however, that the cost
approach should not be disregarded. Southern invested
$295,110,000 in new property during 1979 and $637,900,000
over the past three years. The latter figure is 92% of Dr.
Schoenwald's appraisal of Southern of $690,166,000.

Appraisers for both the Department and petitioners testified
that cost should be given virtually no weight in appraisal. It ap-
pears from the record that original cost may not be a measure of
true value; that depreciation is not intended to reflect an actual
decline in market value, and that no reliable method exists to
evaluate obsolescence. Nevertheless, the Department did consider
cost. The statute requires that it be considered. While we find lit-
tle weight was given to the cost of assets, we must consider that

$637,900,000 had been spent over the past three years for new equipment and other assets, a figure equal to 92 percent of Railroads' appraisal of Southern. Over the past five years, Southern has invested $838,920,000, a figure far in excess of $690,000,000 which Southern says is its true value.

G.S. 105-336(a)(2) specifically requires that book value of system property and the cost of replacement be considered in valuation. The Department correctly considered it.

CONCLUSION

First, we conclude that the Property Tax Commission committed no prejudicial error in its final decision. It properly accorded a "presumption of correctness" to the Department's valuation of the Railroads, but heard all evidence and affidavits offered by the taxpayer. Thereafter, the Commission made extensive findings of fact, properly concluding that the Department's appraisal of the system properties did not exceed the true value in money of the properties; that Railroads did not overcome the presumption of correctness given the appraisal, and that the appraisals of the Department are supported by substantial competent evidence of record.

We have examined each assignment of error, including each argument made by the appellants in support of their contentions, and conclude that the Commission made no prejudicial error in its final order.

In reviewing this matter, this Court has applied the "whole record test." This test does not allow a reviewing court to replace the Commission's judgment as between two reasonably conflicting views, even though the Court could justifiably have reached a different result had the matter been before it "de novo."

The decision of the Property Tax Commission is

Affirmed.

Judges VAUGHN and JOHNSON concur.