IN THE MATTER OF: THE APPEAL OF COLONIAL PIPELINE COMPANY, A PUBLIC SERVICE COMPANY ENGAGED IN BUSINESS IN NORTH CAROLINA, FROM THE VALUATION OF ITS PROPERTY BY THE NORTH CAROLINA PROPERTY TAX COMMISSION FOR 1981

No. 8310PTC392

(Filed 3 April 1984)

Taxation § 25.7— petroleum pipeline—tax valuation—embedded cost of debt—investment tax credits—obsolescence

In determining the ad valorem tax valuation of a petroleum pipeline company's system property in North Carolina, the Department of Revenue and the Property Tax Commission did not err in using the embedded cost of debt rather than the market cost of debt in the income approach to value, in including investment tax credits based on credits for prior years in the income approach, or in the treatment of economic obsolescence in the cost approach to value. G.S. 105-336(a).

APPEAL by Colonial Pipeline Company from a final decision of the North Carolina Property Tax Commission on 4 November 1982. Heard in the Court of Appeals 6 March 1984.

*Attorney General Edmisten by Assistant Attorney General Marilyn R. Rich for North Carolina Department of Revenue, appellee.*

*Hunton & Williams by Robert C. Howison, Jr., Henry S. Manning, Jr., and William L. S. Rowe for Colonial Pipeline Company, appellant.*

BRASWELL, Judge.

The underlying question of this case relates to ad valorem tax valuation for the year 1981 of Colonial Pipeline Company's system property in North Carolina. The North Carolina Department of Revenue established the valuation at $160,000,000, which is 13.162% of the whole system value of $1.216 billion. Colonial contends the true value is $127,956,000, which results mathematically in a difference of $32,044,000. Upon Colonial's appeal to the North Carolina Property Tax Commission, that trial tribunal issued its final agency decision upholding the valuation of the Department of Revenue. Colonial now appeals to this Court.

Colonial Pipeline Company, incorporated in Delaware, is a common carrier of petroleum products owned by ten petroleum related corporations. Colonial is the nation's largest volume petroleum pipeline.

Colonial has a capital structure of 94% debt (almost all of which is long-term) and 6% equity. All of this long-term debt is guaranteed by its stockholders, the ten oil companies, and this guaranteed debt cannot be assumed by a purchaser of Colonial's assets. Colonial's authorized rate of return is externally controlled by the tariff policies of the Federal Energy Regulatory Commission (FERC). These policies permit it to earn on the average not more than a 10% rate of return on its FERC valuation.

Colonial is a public service company and its system property is subject to North Carolina ad valorem appraisal and taxation pursuant to the North Carolina Machinery Act. *See* G.S. 105-335.

The statute specifies that a unit value appraisal shall be made by the Department of Revenue. The purpose of the appraisal is to determine the true value of the system as defined in G.S. 105-283. First, the system as a whole is valued; secondly, a value is established for that part of the system apportionable to North Carolina under G.S. 105-337. True value is defined by G.S. 105-283 as market value.

Unit value appraisals for ad valorem taxation for 1981 of the system were made by two sources: one by the Department of Revenue through W. R. Underhill, in an amount of $1.216 billion; and one by Colonial through Robert H. McSwain, in an amount of $970 million, which was 20% less than Underhill's valuation. The underlying facts on which the appraisers based their opinions are not disputed. What is disputed is the manner in which the appraisers interpreted the statutory requirements of taxation on the market value of the Colonial system properties.

North Carolina's unit valuation procedure is set out in G.S. 105-334, G.S. 105-335, and G.S. 105-283. Under this unit value system approach the market value of Colonial's whole system property is determined without geographical or functional division of the whole. The pipeline runs generally from Texas through the south to the northeast, goes through 13 eastern states and covers about 5,000 miles of line. System property means the operating properties used in the rendition of the company's service, G.S. 105-333(17), and not the business enterprise.

In making its appraisal of whole system property of a public service company, G.S. 105-336(a) requires the Department of Revenue to consider four specific approaches in determining true or market value:

(1) the stock and debt approach,

(2) the cost approach, also known as the depreciated cost method, or book value,

(3) the income approach, also known as the capitalized earnings method, or gross receipts and operating income,

(4) "[a]ny other factor or information that in the judgment of the Department has a bearing on the true value of the company's

system of property." [Note: Neither side offered evidence of this 4th approach.]

Our Court has heretofore interpreted G.S. 105-336(a) as follows:

> A careful reading of the statute reveals that all four approaches are to be used in establishing the appraised value, but no guidelines are set out establishing the weight to be given any single system of valuation. Rather, based on the judgment of the Ad Valorem Tax Division, the Department may exercise its discretion on valuation. The appraisal must not be arbitrary, must be based on substantial evidence, and must be based on lawful methods of valuation.

*In re Southern Railway,* 59 N.C. App. 119, 121, 296 S.E. 2d 463, 466 (1982), *disc. rev. allowed,* 307 N.C. 468, 299 S.E. 2d 222 (1983). The function of the Property Tax Commission, while this case was before it, as reinforced in *In re McElwee,* 304 N.C. 68, 87, 283 S.E. 2d 115, 126-127 (1981), was "[t]o determine the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts, and to appraise conflicting and circumstantial evidence."

As we focus on our scope of review, certain standard principles of law emerge as controlling. There is a presumption of correctness in the taxing authority's assessment. *In re Appeal of Amp, Inc.,* 287 N.C. 547, 562, 215 S.E. 2d 752, 761 (1975). To overcome this presumption the burden of proof is upon the taxpayer, Colonial, to show that:

(1) Either the Department of Revenue, or the final agency, the Property Tax Commission, "used an *arbitrary method* of valuation;" *Id.* at 563, 215 S.E. 2d at 762; or

(2) The Department or Commission "used an *illegal method* of valuation;" *Id.* and

(3) "[T]he assessment *substantially* exceeded the true value in money of the property." *Id.* [Emphasis in original.] *See also In re Odom,* 56 N.C. App. 412, 413, 289 S.E. 2d 83, 85, *cert. denied,* 305 N.C. 760, 292 S.E. 2d 575 (1982); G.S. 105-345.2.

The nature of the scope of our review is the whole record test. G.S. 105-345.2(c). Through it we review the record, the exceptions, and the assignments of error, being admonished by the same statute to take "due account" of the "rule of prejudicial error." Our task is to examine and see if the agency decision, the Property Tax Commission's decision, including its findings of fact and conclusions of law, are supported by competent, material, and substantial evidence in view of the whole record. *In re Southern Railway, supra,* at 124, 296 S.E. 2d at 468.

The thrust of Colonial's assignments of error and argument maintains that the Department of Revenue appraised "Colonial, the business," and "not Colonial's system property in a market exchange." Colonial asserts that the going business enterprise was appraised, not its real and personal property in an ad valorem setting. In making our examination of the issues and contentions we are obliged to analyze the two competing appraisals which were before the Department and Commission. One is exemplified by the appraisal of W. R. Underhill for the Department and the other by Robert H. McSwain for the appellant, Colonial. "[B]oth appraisers relied on essentially the same information and employed the same basic methodology in making their appraisals," as concluded by the Commission.

Specifically Colonial challenges the use by Mr. Underhill of the embedded cost of debt instead of the market cost of debt in the income approach to value, the failure to allow depreciation attributable to economic obsolescence in the cost approach, and inclusion of exhausted investment tax credits in the income streams capitalized under the income and the stock and debt approaches. These factors are alleged to be specific errors of law which, used arbitrarily and unlawfully, resulted in Colonial's system property receiving a value by both the Department and Commission substantially in excess of its market value.

In the agency's final order, finding of fact No. 32, to which no exception was taken, says: "Both appraisers placed primary emphasis on the income and cost indicators of value, giving very little, if any, weight to the stock and debt indicator." In its corresponding conclusion of law the agency says: "We have, therefore, not relied on this indicator [meaning stock and debt] of value in reaching this decision."

After analyzing the evidence and in full consideration of its conflicts, and after considering the approaches of determining market value required by G.S. 105-336(a) to be considered, the Commission concluded "that the Cost Approach is the most reliable indicator of value of . . . Colonial Pipeline Company." The Commission also concluded that it was "reasonable to use the embedded cost of debt because in a typical purchase, the debt would likely be assumed." Mr. McSwain, on the other hand had used "the current cost of debt, which he calculated to be 12.5%." Under McSwain's reasoning and figures the income indicator of value (cost of debt of 12% and return to equity of 15%) would yield $1,107,460.00. Since the Department's income appraisal was $1,186,941,543, the McSwain figure would be 93.3% of the Department's figure. Even though the Commission did not feel equal weight should be given to McSwain's income figure and the Department's cost figure, the arithmetic result of their use would be $1,193,516,944, which sum "is 98.2% of the Department's appraisal of $1,216,000,000." The Property Tax Commission concluded, as do we, that this appraisal figure by the Department (Underhill) was "clearly within the 'zone of reason' as expressed in *Electric Membership Corp. v. Alexander,*" 282 N.C. 402, 192 S.E. 2d 811 (1972). In addition, we hold that in our own application of the rule of prejudicial error, as required by G.S. 105-345.2(c), that the final market value sum in money is not one-sided or warped in favor of the Department.

In making an ad valorem tax valuation the concept of fair value (or market value) as used in the statute is the end product of the methods employed. Since the public service company is not being sold in the market place it becomes necessary to make an estimation of value, to determine a final figure at which the typical willing buyer and seller would transact business. Of necessity, because of no present sale, the appraisers must resort to appraisal and accounting methods required by the statutes and those methods common among businessmen in the field. "To 'appraise' means to value property at what it is worth." 3A Words & Phrases, "Appraise" (Cum. Supp. 1983). The Department of Revenue fulfilled its task. The facts and figures are in the record. There is in this record a rational basis for the conclusions and decision of the Commission upon a review of the evidence in the whole record.

Colonial raises the far-reaching question of whether an appraiser, such as the Department of Revenue, should properly use the current cost of debt approach or the embedded cost of debt approach in determining the capitalization rate under the income approach to value. Colonial cites *Washtenaw County v. Tax Commission*, 126 Mich. App. 535, 337 N.W. 2d 565 (1983) as support for its position. In the Michigan case the plaintiff County had alleged "that the commission erred in refusing to discount the sales price of real estate to reflect the effect of so-called 'creative financing,' [current cost of debt argument in N.C.] which involves some form of seller-extended credit and which results in the enhancement of the selling price." *Id.* The Michigan court held that:

> [A] tax assessment system which does not consider creative financing is in fact unconstitutional. Two people owning identical pieces of real property, both worth precisely the same amount and both bought simultaneously, should not be taxed at different rates merely because they purchased their properties under different financing arrangements.

*Id.* at 541, 337 N.W. 2d at 568.

We recognize in North Carolina as in Michigan and other states that "sales price does not necessarily determine the true cash value of property," *Id.* at 540, 337 N.W. 2d at 568; however, the statutory scheme in North Carolina of true value, meaning market value, does authorize an appraiser to consider the willing buyer and willing seller approach. As stated in *In re Southern Railway, supra*, at 125, 296 S.E. 2d at 468, "For public service companies, the true value of property is its tax value, and 'appraisal' and 'assessment' are synonymous." After analyzing the income approach in *Southern Railway* and in considering and discussing in different language the same principles as examined in the Michigan case of *Washtenaw County, supra*, our court failed to adopt the Michigan holding or rationale. We quote from *In re Southern Railway*:

> We note that an expert witness for the Railroads testified he "had a feeling that fifty per cent of the taxing jurisdictions use the current cost of debt" and "the other fifty per cent use the embedded cost of debt." The Department uses the interest rate expressed on the face of the credit instrument, i.e., the "embedded" cost of debt. To adopt

Railroads' position would invite further questions, *e.g.*, What is the *current* cost of interest for *this* railroad under all the circumstances? We adopt the position that the "other fifty percent" of the taxing jurisdictions using the embedded cost of debt are correct.

*In re Southern Railway, supra,* at 129, 296 S.E. 2d at 470. Thus, although North Carolina has failed to adopt the Michigan position, we feel our result is valid as keeping within the holdings of the other 50% of the several states. *See, Southern Railway Company v. State Board of Equalization,* --- Tenn. ---, --- S.W. 2d --- (1983), for a holding in accord with North Carolina.

We hold that the use of embedded debt will support a calculation of market value. It is not unreasonable for the Commission and Mr. Underhill to have considered the sale of the pipeline from a hypothetical willing seller to a willing buyer. Even Mr. McSwain's testimony reveals that the most likely purchaser of the subject property would be a joint venture of oil company shippers similar to Colonial. On all the evidence it was well within the province of the Commission to conclude that "the most likely purchase price for the subject property would be reproduction cost less depreciation," which calculations produced a figure of $1,484,363,743. The final valuation of $1,216,000,000 is well below a value which could have been chosen by the Commission under the procedures applicable to this case. Again, the appellant has failed to show prejudice. G.S. 105-345.2(c). In the business of making an appraisal the function is to consider typical attributes, and the asserted feature that Colonial's embedded debt is nonassumable has no relevance. Appraisers for hypothetical willing buyers and sellers would not resort to being bound by only valuing financing peculiar to the owner. The Commission was not required to accept Mr. McSwain's theory that his hypothetical willing buyer would be required to refinance the debt. It was within the power of the Commission to accept Mr. Underhill's appraisal theory that the typical willing buyer of a similar system on the open market would buy it by purchasing the seller's equity and assuming its debt. The conclusion of the Commission to accept Underhill's testimony about his use of embedded cost of debt was supported by competent, material, and substantial evidence in view of the whole record. We hold that the use of embedded debt

will support a calculation yielding a usable, typical market value of a public service company's property, to wit: Colonial's.

As to the treatment of investment tax credit in the income approach to value we have considered Colonial's argument that it has no current plans for expansion and has heretofore used up all available income tax credits, and find this assignment to be of no relevance in this appraisal. In making its appraisal the Department was required to consider the typical willing buyer of Colonial's property. Just as Colonial has made capital investments, improvements, and expansions in the years preceding 1981, so would the reasonable and prudent typical purchaser make such investments, improvements, and expansions so as to earn investment tax credits for itself. Even if a disgruntled and unsuccessful bidder at market price of Colonial's system property chose to compete by building its own system reasonably adjacent to Colonial's lines, it is self-evident that such conduct would generate new and additional investment tax credits for this hypothetical competitor. Appropriate appraisal methods and theory have made Mr. Underhill's use of investment tax credits a sound basis upon which to apply his answers to his consideration of this income approach, and we find no error. Further, the record as a whole does support this use by competent, material, and substantial evidence of Colonial's previous year's tax credits.

However, we find it even more striking that Colonial has not shown prejudice by the use of Underhill's methods because they produced an income stream nearly $4,000,000 lower than McSwain's figures. This lowered, not raised, Colonial's system's value.

As to the assignment of error on the treatment of economic obsolescence we find no error. Mr. McSwain's figures on economic obsolescence were a product of his capitalization rate of 14%. The Commission found from the evidence that a rate of 12% was more appropriately indicated. It is noted that McSwain did not use the embedded cost of debt in his income approach analysis. Also, Mr. McSwain testified, "if my capitalization rate were in error, then as a consequence my obsolescence factor and further my cost indicator of value would also be in error." We hold that the Commission's evaluation and findings on the treatment of economic obsolescence were fully supported by competent, material, and substantial evidence in the whole record, and no prejudice has been shown.

We have carefully examined all assignments of error and arguments of counsel. We hold that the appraisal of the Department of Revenue, as upheld in the Property Tax Commission's detailed findings of fact and conclusions of law are fully supported by competent, material and substantial evidence. The Commission's order does not result in a taxing of non-system values of Colonial's property. We find no errors of law in the acts or decision of the Commission. The Commission and Department did not act arbitrarily or capriciously.

Affirmed.

Judges ARNOLD and WEBB concur.